**UNITED STATES of America, Appellee,**

**v.**

**Charles W. RAMSEY, Appellant.**

**Nos. 97–3100, 97–3184.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 9, 1998.

Decided Feb. 9, 1999.

As Amended April 1, 1999.

Francis D. Carter, appointed by the court, argued the cause for the appellant.

Charles W. Ramsey filed a brief pro se.

Michael Fitzpatrick, Assistant United States Attorney, argued the cause for the appellee. Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary-Patrice Brown and John P. Dominguez, Assistant United States Attorneys, were on brief for the appellee.

Before: WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Charles Ramsey was convicted of one count of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii). Through counsel, Ramsey raises several issues, including whether the trial court erred: (1) in allowing the Government to introduce evidence of Ramsey's character; (2) in failing to find entrapment as a matter of law and (3) in sentencing Ramsey to 210 months' imprisonment. Ramsey *pro se* appeals the Government's use of Francisco Fierro as an informant witness. Finding no error, we affirm Ramsey's conviction and sentence.

## I. Background

On December 14, 1995, Ramsey was charged in a two-count indictment with one count of possessing cocaine with intent to distribute, *see* 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii), and one count of attempted possession with intent to distribute, *see* 21 U.S.C. § 846. The charges arose out of a Drug Enforcement Administration (DEA) undercover operation that began earlier in 1995 when Francisco Fierro agreed to assist DEA as an informant, following his arrest for attempted murder and various weapons offenses after a fight in a Miami restaurant. Although Fierro could provide no leads in Florida, DEA decided to use Fierro as an informant in the Washington, D.C. area because his main client had been a Washington-area drug dealer named Charles Ramsey. Fierro informed DEA Agent Ronald Woods that he had delivered substantial quantities of drugs to Ramsey in Washington at least eight times in 1993–94 and that Ramsey accounted for all of his kilogram-level sales.

The first transaction between Fierro and Ramsey took place in Georgetown in early 1993 when Fierro delivered approximately seven ounces of heroin to Ramsey. Seven times over the following year, Fierro delivered between one and ten kilograms of cocaine to Ramsey, selling him into two 39 kilograms of cocaine for approximately $20,000 each.[1] The two men used a delivery procedure that involved a meeting, usually in a hotel room, where Fierro "fronted" Ramsey one or two kilograms. Ramsey then left to sell the cocaine and returned later with payment. Fierro then fronted Ramsey another one or two kilograms and Ramsey repeated the procedure until all of the drugs had been sold, usually within one week. In mid-1994, at his wife's insistence, Fierro left the drug trade.

In September 1995 DEA decided to use Fierro in a "reverse" undercover operation against Ramsey. DEA's initial plan was to conduct the transaction differently from the way Fierro and Ramsey had traditionally done business—by making Ramsey pay for the drugs up front. DEA also sought to increase its control over the operation by having DEA Agent Robert Valentine pose as a drug dealer. Fierro's role was to facilitate the exchange between Valentine and Ramsey.

Between mid-September 1995 and his arrest on November 21, 1995, Ramsey and Fierro had numerous recorded telephone and face-to-face conversations about drug transactions. Most of the conversations were recorded by DEA or by Fierro using DEA-supplied equipment. On September 25, 1995 Ramsey met Fierro in a hotel room. During a videotaped conversation, they discussed a

---

1. The district court ruled that Ramsey's seven cocaine transactions with Fierro were admissible to show intent and absence of mistake under Fed.R.Evid. 404(b) but it ruled any reference to the heroin from their first transaction inadmissible under Fed.R.Evid. 403.

five-kilogram transaction and the fact that Valentine, posing as the distributor, required payment up front. While Ramsey was eager to move several kilograms, he did not have the cash to buy the drugs at delivery. On October 6, 1995 Valentine and Ramsey met without Fierro at a restaurant. Ramsey mentioned that Washington was currently "dry" of cocaine on both the wholesale and retail levels, a fact consistent with DEA information. Ramsey wanted to know if the drugs could be fronted but Valentine refused. Nevertheless, Valentine assured Ramsey that he would contact him about selling five kilograms of cocaine.

On October 24, 1995 Valentine and Fierro met Ramsey at a hotel. They had cocaine with them. In an audio taped conversation Ramsey asked to see the cocaine but, after going "around and around" with Valentine, still refused to pay up front. Tr. at 506. The three men arranged to meet again on November 2, 1995. On November 2, in a videotaped conversation in Valentine's car, Valentine showed Ramsey five one-kilogram bricks. Ramsey said that he could move the cocaine quickly and offered to pay for one kilogram but not until 8:00 p.m. that evening. Becoming increasingly suspicious, Valentine rejected the offer.

After this transaction fell through, it was clear to DEA that Ramsey would not deal unless he was fronted the drugs and that Ramsey preferred to deal only with Fierro. Therefore, DEA changed its strategy by pulling Valentine out of the operation and instructing Fierro to arrange a buy using his old procedure. On November 15, 1995 Fierro contacted Ramsey and offered to front him five kilograms on November 21, 1995. When Ramsey arrived at Fierro's hotel room on the 21st, Fierro showed him the five one-kilogram bricks. Agreeing to a cost of $20,-000 each, Ramsey decided to take two kilograms and said that he would return for the other three. Ramsey then placed the two bricks inside a black duffle bag and left the room. He was arrested by DEA agents in the hallway and the drugs were recovered from his bag.[2]

On May 14, 1996 Ramsey's jury trial commenced in the district court. On May 21, 1996 the jury returned a guilty verdict on the first count. Before sentencing, Ramsey filed a *pro se* motion for a new trial, arguing ineffective assistance of counsel. The district court appointed new counsel on September 16, 1996 and issued an order on June 27, 1997 denying Ramsey's new trial motion as not timely filed. After a hearing, the district court denied Ramsey's objections to the presentence report in a December 15, 1997 order. On December 17, 1997 the district court sentenced Ramsey to 210 months' imprisonment followed by eight years of supervised release. Ramsey timely filed this appeal, requesting that his conviction be reversed or, alternatively, that he be resentenced.

## II. Discussion

### A.

■■■ On appeal, Ramsey advances several arguments, all without merit. First, Ramsey argues that the district court erred by twice admitting Valentine's testimony about Ramsey's past criminal history. The district court, however, did not abuse its discretion[3] in admitting the evidence because Valentine's testimony was not elicited to show Ramsey's propensity to commit a crime, *see* Fed. R.Evid. 404(a), but rather as a response to defense counsel's attempts to challenge the voluntariness of Ramsey's statement and to defense counsel's theory that DEA had entrapped Ramsey based on the "lies" of its

---

**2.** Ramsey gave DEA a written statement before signing a written waiver of his Fifth and Sixth Amendment rights. After the statement had been admitted into evidence at trial, the district court suppressed the statement. Ramsey's defense counsel affirmatively asked that a mistrial not be granted. The district court instructed the jury to disregard the statement and related testimony.

**3.** If defense counsel properly preserved his objection at trial, we review the district court's admission of evidence for abuse of discretion. *See United States v. Salamanca*, 990 F.2d 629, 637 (D.C.Cir.), *cert. denied*, 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993). Nevertheless, the district court's decision to admit evidence, even of prior bad acts, is entitled to "much deference" on review. *United States v. Lewis*, 693 F.2d 189, 193 (D.C.Cir.1982).

informant, Fierro. As the record manifests, Ramsey's counsel raised the subject of his client's extensive criminal history. *See United States v. Davis,* 127 F.3d 68, 71 (D.C.Cir. 1997) ("The elicitation by the defense of the very testimony now challenged ... for its own affirmative purposes, is an independent reason for finding no error...."), *cert. denied,* —— U.S. ——, 119 S.Ct. 215, 142 L.Ed.2d 177 (1998); *United States v. Baumgarten,* 517 F.2d 1020, 1029 (8th Cir.1975) (finding no prejudice from redirect regarding defendant's prior arrests after defense counsel, on cross-examination of government witness, raised issue), *cert. denied,* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975). Moreover, Ramsey was not prejudiced by the testimony since the Government had already introduced evidence of two previous narcotics convictions to rebut Ramsey's entrapment defense.

■ Second, Ramsey contends that Valentine provided opinion testimony about the drug trade even though he was not qualified as an expert witness under Federal Rule of Evidence 702.[4] We believe that the district court did not plainly err in admitting this testimony. Although the trial judge never formally qualified Valentine as an expert witness, his testimony functionally satisfied the requirements for expert testimony set forth in Federal Rule of Evidence 702.[5] *See United States v. Walls,* 70 F.3d 1323, 1326 (D.C.Cir.1995) (finding opinion testimony admissible under Rule 702 as " 'specialized knowledge' [that] would 'assist the trier of fact to understand the evidence' ") (quoting Fed.R.Evid. 702), *cert. denied,* —— U.S. ——, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996); *United States v. McDonald,* 933 F.2d 1519, 1522 n. 2 (10th Cir.) (where "the court heard the witness describe his qualifications, including his specialized knowledge, education, skill and experience, and then allowed the witness to give opinion testimony," appellate court can assume witness was accepted as expert witness), *cert. denied,* 502 U.S. 897, 112 S.Ct. 270, 116 L.Ed.2d 222 (1991); *United States v.*

*Maher,* 645 F.2d 780, 783–84 (9th Cir.1981) (DEA agent not qualified as expert but his expert testimony on drug trade was upheld in light of his experience).

We also find no plain error in the district court's failure to instruct the jury regarding the proper weight to be given Valentine's opinion testimony since Ramsey can show no prejudice from the admission of that testimony. *See United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (in plain error cases appellant bears "burden of persuasion with respect to prejudice"); *United States v. Catlett,* 97 F.3d 565, 571 (D.C.Cir.1996) (no bar in this Circuit to "dual testimony as both a fact and expert witness"); *see also United States v. Anderskow,* 88 F.3d 245, 251 (3d Cir.) (no prejudice in light of overwhelming evidence of defendant's predisposition and guilt and fact that Government did not rely on challenged opinion testimony during summation), *cert. denied,* —— U.S. ——, 117 S.Ct. 613, 136 L.Ed.2d 537 (1996). In fact, Ramsey's own counsel repeatedly asked Valentine for opinion testimony during cross-examination.

■ Nor do we accept Ramsey's contention that Valentine's purported opinion testimony violated Federal Rule of Evidence 704 given the context of the prosecutor's question and Valentine's answer. *See United States v. Smart,* 98 F.3d 1379, 1388 (D.C.Cir.1996) (adopting Seventh Circuit test to determine whether expert testimony violates Rule 704(b), which "assess[es] two key elements," to wit: "(1) the language used by the questioner and/or the expert, including use of the actual word 'intent'; and (2) whether the context of the testimony makes clear to the jury that the opinion is based on knowledge of general criminal practices, rather than some special knowledge of the defendant's mental processes") (quotation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 1271, 137 L.Ed.2d 349 (1997). After an initial defense objection, the district court allowed the prosecutor to ask Valentine, "[D]id you have information independent of what you learned

---

**4.** Because Ramsey made no objection at trial, our review is for plain error. *See Lewis,* 693 F.2d at 193.

**5.** Rule 702 states in part: "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

from [Fierro] and Mr. Ramsey himself which led you to believe that Mr. Ramsey would be ready and willing and able to engage in this cocaine transaction?" Tr. at 552. Ramsey argues that by answering "Yes" to the prosecutor's question, Valentine, if considered an expert witness, violated Rule 704(b) ("[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto"). Since predisposition to commit a crime implicates Ramsey's entrapment defense, he argues that Valentine's affirmation that he was "ready and willing and able to engage in this cocaine transaction," without a limiting jury instruction is plain error, citing *United States v. Boyd*, 55 F.3d 667, 671 (D.C.Cir.1995), and *United States v. Williams*, 980 F.2d 1463, 1466 (D.C.Cir.1992). Valentine, however, testified merely as to his agency's knowledge and intent at the time it decided to initiate an undercover operation against Ramsey to rebut defense counsel's suggestion that DEA relied solely on Fierro for information about Ramsey's willingness to deal drugs. *See, e.g.*, Tr. at 550 (prosecutor affirming, "All I want to ask [Valentine] is if he has pertinent information that led him to believe that there was not going to be an entrapment issue . . . .").

■ We next reject Ramsey's claim of entrapment as a matter of law because the record contains ample evidence that Ramsey was predisposed to commit a drug offense.

*See United States v. Neville*, 82 F.3d 1101, 1107 (D.C.Cir.1996); *United States v. Budd*, 23 F.3d 442, 445 (D.C.Cir.1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995).[6] The record reflects that Ramsey had a long history of dealing in substantial quantities of drugs. This evidence includes: 1975 and 1976 convictions of similar offenses, *see Neville*, 82 F.3d at 1107–08 (finding evidence of prior criminal activity probative of appellant's predisposition); testimony by Fierro, Valentine and Agent Woods that Ramsey had frequently and recently bought large quantities of cocaine from Fierro using "fronting" to pay for the drugs; and Ramsey's recorded admissions of previous narcotics deals and interest in having Fierro supply him with cocaine. Although Ramsey points to his several unproductive meetings with Fierro and Valentine to suggest that he was reluctant to buy, his reluctance evaporated as soon as Fierro agreed to front him the drugs.

■ Nor did the district court err in counting the 39 kilograms of cocaine Ramsey purchased from Fierro in 1993–94 as part of the "same course of conduct" as Ramsey's offense of conviction under the Sentencing Guidelines. U.S.S.G. § 1B1.3(a)(2) (requiring district court to determine offense level "solely with respect to offenses . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction"); *see United States v. Ramsey*, No. 95–326, at 3–6 (D.D.C. Dec. 15, 1997) (sentencing opinion); *see also United States v. Pinnick*, 47 F.3d 434, 438 (D.C.Cir.1995) (clear error review of district court's determination that

---

**6.** To establish entrapment Ramsey must first show that he was induced by the Government to commit a crime he otherwise would not have committed. If Ramsey meets his burden, the Government must then prove beyond a reasonable doubt that he was predisposed to commit the crime. *See Neville*, 82 F.3d at 1107; *Budd*, 23 F.3d at 445. Under our "bifurcated approach," "the jury, not the judge, decides whether the defendant has carried his burden of proving inducement" and, if so, whether "the government has met its burden of proving predisposition." *United States v. Whoie*, 925 F.2d 1481, 1483 (D.C.Cir.1991). Our review "focus[es] on the predisposition issue" and "must uphold the jury's verdict if, viewing the evidence in the light most favorable to the Government, a reasonable jury could have found that the Government proved beyond a reasonable doubt that

the defendant was predisposed to commit the crime." *Neville*, 82 F.3d at 1107 (citing *Budd*, 23 F.3d at 445 & n. 2). To establish predisposition, the Government must show a "state of mind which readily responds to the opportunity furnished by the officer or his agent to commit the forbidden act," *United States v. Burkley*, 591 F.2d 903, 916 (D.C.Cir.1978) (quotation omitted), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979), based on "the entirety of the events surrounding the ultimate commission of the crime," *United States v. Kelly*, 748 F.2d 691, 699 (D.C.Cir.1984). Relevant considerations include: Ramsey's level of interest in the transaction, the pressure applied by the Government, any reluctance displayed by Ramsey and Ramsey's past illegal conduct. *See Neville*, 82 F.3d at 1107–08; *Budd*, 23 F.3d at 446; *Burkley*, 591 F.2d at 916.

past conduct is related to offense of conviction). "Extraneous offenses qualify as part of the same course of conduct if 'they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'" *Pinnick*, 47 F.3d at 438 (quoting U.S.S.G. § 1B1.3(a)(2), comment n.9(B)). Thus, the district court's inquiry must "focus[ ] on whether the defendant repeats the same type of criminal activity over time and engage[s] in an identifiable behavior pattern of specified criminal activity." *Id.* (quotation omitted). Here, the district court went beyond an analysis of temporal proximity, noting that the transactions involved the same parties, *see United States v. Jones*, 948 F.2d 732, 737 (D.C.Cir.1991), were of a similar character and nature and involved between one and ten one-kilogram bricks of cocaine, *see Pinnick*, 47 F.3d at 439, and that the temporary hiatus was Fierro's, rather than Ramsey's, decision. *See United States v. Santiago*, 906 F.2d 867, 872 (2d Cir.1990) (transactions separated by 8–14 months while buyer was incarcerated were sufficiently similar in other respects to constitute same course of conduct). Since Ramsey's nine drug transactions with Fierro manifested an ongoing relationship and pattern of criminal activity, the district court did not clearly err in counting 39 kilograms from previous transactions as part of the "same course of conduct" under U.S.S.G. § 1B1.3(a)(2).

Finally, Ramsey cannot establish sentencing entrapment because the district court correctly found that he was predisposed to purchase five kilograms on November 21, 1995. *See United States v. Shepherd*, 102 F.3d 558, 566 (D.C.Cir.1996) (for sentencing entrapment "main element ... is ... the defendant's predisposition") (quotation omitted); *Walls*, 70 F.3d at 1329 (same); *see also United States v. Washington*, 106 F.3d 983, 1015 (D.C.Cir.1997) (reviewing district court's findings of fact for clear error, "giving due deference to the district court's application of the Guidelines to the facts"), *cert. denied*, —— U.S. ——, 118 S.Ct. 446, 139 L.Ed.2d 382 (1997). For instance, the record shows *inter alia* that Ramsey saw the five kilograms, asked Fierro to supply drugs weekly and routinely purchased up to ten, but ordinarily five, kilograms using the fronting method. *See Shepherd*, 102 F.3d at 566.[7]

### B.

Ramsey's *pro se* challenge[8] requires a lengthier discussion not because of its merit but because our Circuit has not heretofore ruled on the challenge that our sister circuit courts have rejected. Ramsey asks this Court to consider whether the Government's use of Fierro as an informant violated 18 U.S.C. § 201(c)(2).[9] Ramsey made his challenge after the Tenth Circuit, in an unprecedented[10] decision, held that a federal prosecutor's agreement granting leniency to an accomplice in return for truthful testimony as a government witness violated the plain

7. In any event our decision affirming the district court's finding that Ramsey's relevant conduct included the 39 kilograms that he purchased in 1993–94 makes his sentencing entrapment argument moot. The district court attributed 44 kilograms of cocaine to Ramsey, of which five kilograms were from his November 21, 1995 offense of conviction, in calculating a base offense level of 34. Nevertheless, Ramsey asserts that he was only predisposed to purchase one of the five kilograms of cocaine from Fierro on November 21, 1995. *See* Appellant's Br. at 31–32; Appellee's Br. at 31 & n.22. *But see* Sentencing Tr. at 13 (Ramsey's counsel informed court that relevant amount of drugs was "two kilograms of cocaine [Ramsey] walked out the door with"). According to U.S.S.G. § 2D1.1(c)(3), however, "[a]t least 15 KG but less than 50 KG of [c]ocaine" places Ramsey at level 34. Thus, reducing the amount of cocaine attributable to Ramsey by four (or even five) kilograms is of no significance.

8. Because Ramsey makes this argument for the first time on appeal, we apply the plain error standard of review. *See* Fed.R.Crim.P. 52(b); *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

9. Section 201(c)(2) subjects to criminal liability: "Whoever ... directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness" in a federal trial or proceeding.

10. Until *Singleton*, no other court in the thirty-six year history of section 201(c)(2) had applied its prohibition to a prosecutorial grant of leniency in exchange for truthful testimony.

language of section 201(c)(2). *See United States v. Singleton*, 144 F.3d 1343, 1352 (10th Cir.1998). The court therefore held inadmissible the accomplice's testimony and reversed Singleton's conviction. *See id.* at 1347. The Tenth Circuit sitting en banc has since reversed the panel decision. *See United States v. Singleton*, 1999 WL 6469 (10th Cir. Jan.8, 1999) (en banc). In the meantime, the *Singleton* panel's interpretation of section 201(c)(2) has been rejected by the Fifth and Sixth Circuits and every federal district court to consider the issue, save three. *See, e.g., United States v. Haese*, 162 F.3d 359, 366 (5th Cir.1998) (rejecting *Singleton* and noting that circuit precedent has "consistently … upheld government efforts to provide benefits to witnesses in exchange for testimony") (quotation omitted); *United States v. Webster*, 162 F.3d 308, 357–58 (5th Cir.1998) (rejecting *Singleton* on plain error review); *United States v. Ware*, 161 F.3d 414 (6th Cir.1998); *United States v. Szur*, 1998 WL 661484 (S.D.N.Y. Sept.24, 1998); *United States v. Mejia*, 1998 WL 598098 (S.D.N.Y. Sept.8, 1998); *United States v. Barbaro*, 1998 WL 556152 (S.D.N.Y. Sept.1, 1998) (rejecting *Singleton* because of historical acceptance of leniency in exchange for truthful testimony); *United States v. Juncal*, 1998 WL 525800 (S.D.N.Y. Aug.20, 1998) (relying on historical acceptance of leniency in exchange for testimony and on canon of statutory construction requiring that government be expressly included in statutory text to come within statute's purview); *United States v. Reid*, 19 F.Supp.2d 534 (E.D.Va.1998); *United States v. Arana*, 18 F.Supp.2d 715 (E.D.Mich.1998); *United States v. Dunlap*, 17 F.Supp.2d 1183 (D.Colo.1998); *United States v. Pungitore*, 15 F.Supp.2d 705 (E.D.Pa.1998); *United States v. Guillaume*, 13 F.Supp.2d 1331 (S.D. Fla.1998); *United States v. Eisenhardt*, 10 F.Supp.2d 521 (D.Md.1998) (criticizing *Singleton*'s reasoning, particularly application of exclusionary rule); *United States v. Gabourel*, 9 F.Supp.2d 1246 (D.Colo.1998). *But see United States v. Mays*, No. 97–CR–127 (E.D. Tenn. Sept. 18, 1998); *United States v. Lowery*, 15 F.Supp.2d 1348 (S.D.Fla.1998) (agreeing with *Singleton* that plain meaning of section 201(c)(2) encompasses government); *United States v. Fraguela*, 1998 WL 560352 (E.D.La. Aug.27, 1998) (adopting *Lowery*).

For several reasons, we hold that section 201(c)(2) does not prohibit the Government from granting leniency in exchange for truthful testimony.

We first look to the Dictionary Act, 1 U.S.C. § 1, which is to be used "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise," and note that its definition of "whoever" does not expressly include the United States. 1 U.S.C. § 1 (defining "whoever" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). Moreover, we conclude that the meaning of "[w]hoever" in section 201(c)(2) should be limited by the canon of construction that a statute does not apply to the government or affect governmental rights unless the text expressly includes the government. In *United States v. Nardone*, 302 U.S. 379, 383, 58 S.Ct. 275, 82 L.Ed. 314 (1937), the Supreme Court declared, "[T]he cases in which [the canon] has been applied fall into two classes." First, the canon applies if application of the statute to the United States "would deprive the sovereign of a recognized or established prerogative title or interest." *Id.* There are, according to *Nardone*, two exceptions to this class of cases. Under the first exception, "[t]he rule of exclusion of the sovereign is less stringently applied where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself." *Id.*[11]

The *Nardone* canon also applies if application of the statute to public agents would create an obvious absurdity. *See id.* at 384, 58 S.Ct. 275; *see also United States v. Granderson*, 511 U.S. 39, 47 n. 5, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (statute's plain meaning disregarded if it "leads to an absurd result").[12]

---

**11.** The second exception to this class of cases provides that "the sovereign is embraced by general words of a statute intended to prevent injury and wrong" even if the statute infringes upon a recognized government prerogative. *Nardone*, 302 U.S. at 384, 58 S.Ct. 275.

**12.** As at least two courts have noted, *Nardone* did not expressly so limit the canon's applicability.

We first conclude that application of section 201(c)(2) to the United States would deprive the sovereign of a critically important interest, one that is well established in our legal system and recognized by the courts, the Congress and, more recently, the United States Sentencing Commission. The prosecutorial prerogative to recommend leniency in exchange for truthful testimony arises from English common law, *see Ware*, 161 F.3d at 419, and has been repeatedly approved by the United States Supreme Court, which noted its "ancient" origins and "established usage" in holding:

> that an accomplice duly admitted as a witness in a criminal prosecution against his associates ... , if he testifies fully and fairly, will not be prosecuted for the same offence.... When he fulfills those conditions he is equitably entitled to a pardon, and the prosecutor, and the court if need be, when fully informed of the facts, will join in such a recommendation.

*The Whiskey Cases (United States v. Ford)*, 99 U.S. 594, 599–601, 604, 25 L.Ed. 399 (1878). Although the Supreme Court has not yet addressed the issue before us, it has consistently upheld the practice of plea bargaining. Other Supreme Court cases sanction by implication a prosecutorial promise of leniency in exchange for truthful testimony. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679–80, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (concluding that court's refusal to allow defendant to question witness about dismissed charge violated Sixth Amendment right to confrontation); *Roberts v. United States*, 445 U.S. 552, 558, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) (affirming sentence due in part to defendant's refusal to cooperate with government in spite of being offered "favorable disposition of his case"); *id.* at 568, 100 S.Ct. 1358 (Marshall, J., dissenting) (expressly upholding plea bargaining process); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (holding prosecution's failure to disclose promise of leniency to witness, provided in exchange for that witness's testimony, violated due process).

Circuit courts have been more explicit in their approval of a prosecutorial plea agreement with an accomplice or codefendant conditioned on his truthful testimony for the Government. *See, e.g., United States v. Gomez*, 810 F.2d 947, 956 (10th Cir. ), *cert. denied*, 482 U.S. 908, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987); *United States v. Dailey*, 759 F.2d 192, 196 (1st Cir.1985) (noting that "[l]ong ago the courts rejected the notion that the testimony of codefendants and other interested witnesses was so likely to be unreliable that it should be excluded"); *United States v. Kimble*, 719 F.2d 1253 (5th Cir. 1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *United States v. McCallie*, 554 F.2d 770, 772 (6th Cir.1977); *United States v. Barrett*, 505 F.2d 1091, 1102 (7th Cir.1974) (sanctioning grant of civil immunity in exchange for testimony and stating, "If the government can excuse criminal *or* civil liability in settling a criminal case, surely it can use that power of compromise to obtain guilty pleas or to procure testimony in other proceedings. Both are legitimate objectives of plea bargaining.") (emphasis original), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). According to the Fifth Circuit, "No practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." *United States v.Cervantes–Pacheco*, 826 F.2d 310, 315 (5th Cir.1987), *cert. denied sub nom. Nelson v. United States*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

Moreover, the Federal Rules of Criminal Procedure recognize and accept plea bargaining. Although Rule 11(e), which sets out the procedure governing plea agreements, does not identify the types of commitments the Government may ask of individuals in exchange for leniency, the Advisory Committee notes recognize that an agreement may require more than relinquishing the right to

---

*See Ware*, 161 F.3d at 419 n. 1; *Arana*, 18 F.Supp.2d at 718 ("Nothing in [*Nardone*] or any other Supreme Court decision 'limits' application of the canon to only the two classes of cases

mentioned."). *Nardone* simply noted that the canon "has been applied" to the two types of cases discussed therein. *Nardone*, 302 U.S. at 383, 58 S.Ct. 275.

trial. According to the notes to the 1975 amendments of Rule 11:

> [It is apparent, though not explicitly stated, that Rule 11(e) contemplates that the plea agreement may bind the defendant to do more than just plead guilty or nolo contendere. For example, the plea agreement may bind the defendant to cooperate with the prosecution in a different investigation. The Committee intends by its approval of Rule 11(e) to permit the parties to agree on such terms in a plea agreement.]

Fed.R.Crim.P. 11 Advisory Committee's notes (1975) (brackets in original); *see also id.* Advisory Committee's notes (1974) ("plea agreement[s] may also contribute to the successful prosecution of other more serious offenders").

In addition, both the United States Code and the Sentencing Guidelines contemplate the prosecutor's use of a plea agreement in exchange for truthful testimony against a defendant. For example, the Sentencing Reform Act of 1984 established the United States Sentencing Commission and explicitly required it "to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." 28 U.S.C. § 994(n). The 1984 Act also allows a court on the Government's motion "to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." 18 U.S.C. § 3553(e). The Sentencing Guidelines themselves authorize the sentencing court to depart downward for any defendant who provides "substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1. Among the factors the court may consider in determining whether to grant the Government's motion for downward departure are "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant." U.S.S.G. § 5K1.1(a)(2).

Moreover, application of section 201(c)(2) to the Government obstructs the sovereign's, not the individual prosecutor's, interest in plea agreements inasmuch as the prosecutor brings federal criminal charges in the name of the United States. As the Sixth Circuit aptly noted:

> When an assistant United States Attorney (AUSA) enters into a plea agreement with a defendant, that plea agreement is between the United States government and the defendant. When an AUSA uses at trial testimony obtained through a plea agreement or an agreement not to prosecute, he does so as the government. An AUSA who, pursuant to the provisions of the United States Sentencing Guidelines, moves for a downward departure under § 5K1.1, does so as the government.

*Ware,* 161 F.3d at 421; *see also* 18 U.S.C. § 3553(e) (allowing sentence reduction "[u]pon motion of the government").

Nor are we persuaded by any assertion that the Congress intended section 201(c)(2) "to prevent fraud, injury, or wrong" arising from government offers of leniency in exchange for truthful testimony. A prosecutor is obligated to disclose any benefit conferred on any witness, *see Giglio,* 405 U.S. at 150, 92 S.Ct. 763, and a benefit conferred under a plea agreement must be approved by the district court. *See* Fed.R.Crim.P. 11(e). Furthermore, any prosecutor who attempts to "corruptly" bribe a witness could be prosecuted under 18 U.S.C. § 201(b)(3).[13] Accordingly, having determined that neither of the exceptions to the first class of *Nardone* cases applies, we conclude that application of section 201(c)(2) to the Government would deprive the sovereign of a recognized and es-

---

13. Section 201(b)(3) subjects to criminal liability: Whoever ... directly or indirectly, *corruptly* gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness [in federal trials or proceedings] or with intent to influence such person to absent himself therefrom....

18 U.S.C. § 201(b)(3) (emphasis added). That section 201(b)(3) applies to federal prosecutors while section 201(c)(2) does not, despite the similarities between the two sections, follows from

tablished prerogative and interest. *See Nardone,* 302 U.S. at 383, 58 S.Ct. 275.

In addition, we believe this case falls within the second class of cases to which the *Nardone* canon applies. Application of section 201(c)(2) to a federal prosecutor offering leniency in exchange for truthful testimony works obvious absurdities. To interpret section 201(c)(2) as the Tenth Circuit originally did, *see Singleton* 144 F.3d at 1346–48, would expose to criminal liability any federal prosecutor who entered into a plea agreement pursuant to Rule 11(e) and any federal judge who either approved a Rule 11(e) plea agreement or reduced a sentence pursuant to 18 U.S.C. § 3553(e) or U.S.S.G. § 5K1.1(a)(2) based in part on a witness's testimony.[14] *See Arana,* 18 F.Supp.2d at 719; *Dunlap,* 17 F.Supp.2d at 1184–87. In addition, such an interpretation of section 201(c)(2) would end a centuries-old practice of allowing cooperating criminals to testify against their confederates in hopes of receiving more lenient treatment. Faced with a ban on a plea agreement in exchange for cooperative testimony, the Government would face a near impossible task in trying to convict those higher up in a criminal organization. *See generally Kastigar v. United States,* 406 U.S. 441, 446, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (noting enactment of immunity statutes "reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime").

The application of section 201(c)(2) to public officers also produces an absurd conflict with statutory schemes prescribing reduced sentences and immunity for co-conspirators and accomplices who provide testimony for the Government. *See, e.g.,* 18 U.S.C § 3521 (Witness Relocation and Protection Act authorizing Attorney General to exchange things of value for witness's agreement "to testify"); 18 U.S.C § 3553(e) (reduction be-

low statutory minimum sentence authorized in exchange for "substantial assistance"); 18 U.S.C §§ 6001–05 (federal immunity statutes); 28 U.S.C. § 994(n) (requiring Sentencing Commission to provide for sentencing guideline reductions); *Gabourel,* 9 F.Supp.2d at 1247 (rejecting original *Singleton* interpretation after examining "the larger statutory context, its object and policy"). For instance, 18 U.S.C. § 6003, a provision of the Organized Crime Control Act of 1970, authorizes a United States Attorney, with the approval of the Attorney General or certain other federal officials, to seek a court order granting immunity to a witness whose testimony he considers necessary in the public interest. Yet a grant of immunity pursuant to 18 U.S.C. § 6003 is clearly "[some]thing of value" given "for or because of the testimony under oath or affirmation," 18 U.S.C. § 201(c)(2). *See Ware,* 161 F.3d at 423 (concluding that more recently enacted statutes than section 201(c)(2) "specifically allow what [*Singleton's* original] broad interpretation of the more generally applicable § 201(c)(2) would prohibit"). We therefore conclude that application of section 201(c)(2) to federal prosecutors offering leniency in exchange for testimony works obvious absurdities. For these reasons, we apply the *Nardone* canon "which provides that statutes do not apply to the government or affect governmental rights unless the text expressly includes the government," *Nardone,* 302 U.S. at 383, 58 S.Ct. 275, and interpret "[w]hoever" as used in 18 U.S.C. § 201(c)(2) to be exclusive of the United States.

If we were to find the language of 18 U.S.C. § 201(c)(2) ambiguous, which we do not, an examination of the relevant legislative history would be appropriate. *See Saadeh v. Farouki,* 107 F.3d 52, 57 (D.C.Cir.1997) ("If the language is plain on its face, courts do not ordinarily resort to legislative history."). *Cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837,

---

*Nardone;* the Government has no recognized interest in paying a witness to give untruthful testimony and no absurdity would result in punishing a prosecutor who offers a witness money or any other thing of value to obtain untruthful testimony.

**14.** As the Sixth Circuit correctly noted:

This result cannot be avoided by attempting to argue that the language of the statute forbids

only the use of the testimony from a witness who has entered into the plea agreement, not the plea agreement itself. Because a defendant who enters into a plea agreement pursuant to Rule 11 must appear before the court and enter his plea, the defendant's entry of that plea is testimony.

*Ware,* 161 F.3d at 421 (citing *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).

843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (If "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). Nothing in section 201(c)(2)'s legislative history indicates that the Congress intended to apply the statute to the Government's plea arrangements. Moreover, a *sub silentio* change of this magnitude to the well-established prosecutorial practice of granting leniency in exchange for testimony would be virtually unprecedented. Such a change ignores the rule of statutory construction that "[a] party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 521, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). Although House Report No. 87–748, notes that section 201(h) (the predecessor of section 201(c)(2)) "forbids offers of payments to a witness of anything of value 'for or because of' testimony given or to be given," the legislative history contains no indication that section 201, originally enacted in 1962 by Pub.L. No. 87–849, was designed to terminate the longstanding prosecutorial prerogative of exchanging leniency for truthful testimony. H.R.Rep. No. 87–748, at 16 (1961); *see also* S.Rep. No. 87–2213 (1961) (containing same language). The legislative history of the 1970, 1986 and 1994 amendments to section 201 is also silent on the issue. Nor do those amendments address the resulting contradiction in the statutory scheme if the Congress had intended section 201(c)(2) to apply to the Government. In particular, the 1986 and 1994 amendments were passed after 18 U.S.C § 3553(e) (reduction below statutory minimum sentence), 18 U.S.C § 6003 (immunity statute) and 28 U.S.C. § 994(n) (requiring Sentencing Commission to allow sentencing guideline reductions) but the potential conflict with these statutes was never addressed. As the Sixth Circuit rightly concluded, "Clearly the explanation is that no such conflict exists as § 201(c)(2) was never intended to apply to the government." *Ware,* 161 F.3d at 423 (citing Pub.L. No. 99–570 § 1007, 1986 U.S.C.C.A.N. (100 Stat. 32707) 5393; Pub.L.

No. 99–646 § 48, 1986 U.S.C.C.A.N (100 Stat. 3592) 6139).

Finally, even if federal prosecutors were subject to section 201(c)(2), that fact would not justify excluding Fierro's testimony. The Congress prescribed a fine or imprisonment for a violation of section 201(c)(2). "Where Congress has both established a right and provided exclusive remedies for its violation, we would 'encroach upon the prerogatives' of Congress were we to authorize a remedy not provided for by statute." *Ware,* 161 F.3d at 424 (quoting *United States v. Frazin,* 780 F.2d 1461, 1466 (9th Cir.), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986)); *see United States v. Thompson,* 936 F.2d 1249, 1251–52 (11th Cir. 1991) (court may not suppress testimony for statutory violation unless Congress explicitly or implicitly provided exclusion as a remedy for a violation), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 975, 117 L.Ed.2d 139 (1992); *see also United States v. Hensel,* 699 F.2d 18, 29 (1st Cir.1983) (exclusionary rule fashioned to vindicate "specific, constitutionally protected rights"), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. Harrington,* 681 F.2d 612, 615 (9th Cir. 1982) ("There must be an exceptional reason, typically the protection of a constitutional right, to invoke the exclusionary rule."). Moreover, the Supreme Court has acknowledged the "substantial" cost of exclusion which "hamper[s]" the enforcement of valid laws and keeps "concededly relevant and reliable evidence" from the jury. *United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *see also United States v. Payner,* 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) ("[U]nbending application of the exclusionary sanction … would impede unacceptably the truth-finding functions of judge and jury. After all, it is the defendant, and not the constable, who stands trial.").

### III. Conclusion

For the foregoing reasons, we hold that 18 U.S.C. § 201(c)(2) does not prohibit the Government from granting leniency in exchange for a witness's truthful testimony. As discussed earlier, Ramsey's other assignments

of error are without merit.   Accordingly, the defendant's conviction and sentence are

*Affirmed.*