USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-2035

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JOSEPH P. MURPHY,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]

 Before

 Selya, Boudin and Lipez,
 
 Circuit Judges.
 
 
 
 
 James C. Rehnquist with whom Goodwin, Procter & Hoar LLP was
on brief for appellant.
 Ben T. Clements, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, and S. Theodore Merritt,
Assistant United States Attorney, were on brief for the United
States.

September 30, 1999

 
 

 BOUDIN, Circuit Judge. Joseph Murphy, a criminal defense 
lawyer, was indicted on charges that he participated in an
extortion scheme with two Boston police detectives. The
detectives, Kenneth Acerra and Walter Robinson, pled guilty to a
number of offenses involving a much greater range of misconduct
than that for which Murphy was charged. But Murphy stood trial,
was convicted by a jury, and now appeals. The evidence offered by
the government at trial permitted the jury to find that the
following occurred.
 Over a substantial period starting in 1990 and extending
to 1996, Acerra and Robinson engaged in a scheme that included
obtaining warrants based on information supplied by them and known
by them to be false. Acerra and Robinson made a number of searches
and seizures using warrants based on such falsified applications
before and after the Murphy incidents. In the raids, the
detectives seized cash, representing drug sale proceeds, that they
kept for themselves instead of turning it over to the Boston Police
Department. Theft, not extortion, was the central element in these
crimes.
 The two incidents involving Murphy and leading to the
extortion charges against him both occurred in 1992. The first
began on May 6, 1992, when a third detective, John Brazil, obtained 
search warrants to search an apartment on Forest Hills Street in
Jamaica Plain and a taxicab owned by Bruno Machore. Brazil
prepared the warrant applications at Acerra's direction,
fabricating most of the "facts" alleged in the applications. The
warrants were executed by all three detectives, cocaine and $10,000
in cash were seized, and Machore and two others were arrested and
held on state charges. Apparently fearing that someone would
reveal the seizure of cash, the detectives reported to their
superiors that they had seized $7,500; they kept the balance for
themselves.
 After Machore's arrest, Murphy (who was Machore's
attorney) told him that for payments of $1,000 each to Acerra and
Robinson the case would be dismissed. Machore agreed, believing
the money would come from the seized funds. In an initial effort
to obtain dismissal, all three detectives failed to appear at
Machore's district court trial; but no dismissal was obtained since
Machore had not been brought from jail to the trial court.
Thereafter, Robinson managed to get the case against Machore
dismissed by conveying untrue information about the case to the
assistant district attorney. 
 Murphy then moved for the return of the $7,500 on the
ground that it had been improperly seized, and based on false
statements by Robinson and without objection from the prosecutor,
the judge ordered a return of the money. Murphy had Machore
authorize the attorney to receive the $7,500 from the Boston Police
Department. Murphy obtained the money on June 29, 1992, put $1,500
in his business account, and took out the balance in cash; whether
some was then paid to the detectives is unknown. In any event,
none of the money was ever returned to Machore. 
 The second incident began even before the first one
ended, on May 29, 1992, when Acerra and Robinson obtained warrants
(again, based on false statements) to search two apartments in a
building on Edgemere Road in West Roxbury. Machore and his
associate, Francisco Almonte, used one apartment to store cocaine
and the other for drug sale proceeds and as living quarters. Using
the warrants, detectives, including Acerra and Robinson, conducted 
searches of the apartments on May 29, 1992, and seized cocaine and
between $16,000 and $17,500 in cash. None of the cash was reported
to the Boston Police Department.
 Almonte, Machore and two others were arrested in
connection with these new searches. Murphy, representing Machore,
told the latter that this time Robinson and Acerra wanted a total
of $50,000 for the release of Machore and his three co-defendants. 
Since it was believed that Almonte had access to money, Murphy
visited Almonte in jail four times (always without the knowledge of
Almonte's own attorney). Murphy advised Almonte of the $50,000
demand and brushed aside Almonte's suggestion that the funds just
seized from the Edgemere Road apartments might count toward the
larger amount now demanded.
 Since neither Almonte nor Machore had cash available, a
plan developed to get them released from jail so that they could
raise the $50,000. Murphy explained to Almonte, and also to
Machore's girlfriend (who was Almonte's sister), that the
detectives would fail to appear at the grand jury, leading to the
release of the defendants under a state law that required release
when a grand jury does not indict within two sittings. From July
to September 1992, Robinson failed to appear at the grand jury five
times in a row, and Machore and two of his co-defendants were
eventually released.
 Almonte was kept in jail on another case. Machore and
Almonte were thereafter indicted on drug charges incident to the
Edgemere Road seizure. When he was released on bail about two
weeks later, Almonte was called in by Murphy and told that the
detectives had done their part and "now it's your turn." Instead
of paying, Almonte went to trial and was acquitted, due in part to
the fact that none of the detectives testified about finding any
money in the apartment in which Almonte was arrested. Much later,
when an investigation began into the detectives' warrant practices,
Murphy made false statements to help conceal the detectives'
failure to report funds seized in both of the incidents.
 In March 1997, Robinson, Acerra and Murphy were indicted
in federal district court. On October 2, 1997, an amended
superseding indictment against all three defendants was returned.
While the indictment charged the detectives with a broad scheme and
many wrongful seizures, Murphy was named in only three counts:
count 2, based on both of the incidents just described, charged
Murphy (and the two detectives) with conspiracy to commit extortion
under color of official right, 18 U.S.C. 1951; and counts 3 and
4, under the same statute together with the aiding and abetting
statute, id. 2, charged extortion (based on the first incident)
and attempted extortion (based on the second).
 The two detectives pled guilty in March 1998 to a broadly
framed conspiracy count and two other offenses. Murphy's trial
took place in April 1998 and included government testimony from
Brazil and Machore, among others. The jury found Murphy guilty on
all three counts. Thereafter, in August 1998, the district court
sentenced Murphy to 24 months imprisonment. Murphy now appeals,
challenging both his conviction and his sentence.
 Murphy's first ground of appeal concerns alleged errors
by the district court in admitting what Murphy claims were hearsay 
statements under the co-conspirator exception to the hearsay rule. 
Fed. R. Evid. 801(d)(2)(E). In this circuit, a predicate to the
admission of hearsay evidence under the co-conspirator exception is
a finding by the district judge that a conspiracy existed of which
the defendant was a member, and that the statement was made in
furtherance of that conspiracy. See United States v. Petrozziello,
548 F.2d 20, 23 (1st Cir. 1977). Murphy argues that the district 
judge did not make a timely Petrozziello finding of conspiracy
before the case went to the jury, that the Petrozziello finding
made after the jury returned with the verdict was erroneous, and
that the admission of the alleged hearsay was prejudicial and did
not constitute harmless error.
 Although the government says that the hearsay objection
was not preserved, the point is debatable and it is easier to deal
with the claims on their merits. A number of the specific
statements to which Murphy objects on appeal were from Brazil's
testimony. The gist of some of these statements was that Robinson
and Acerra had a practice of instructing Brazil to falsify
information in warrant applications and further instructing him not
to report moneys seized in subsequent raids conducted pursuant to
such warrants. Brazil testified that he was generally so
instructed in other, unnamed incidents and, specifically, that he
was told to falsify the May 6 warrant applications and not to
report the May 29 seizure (as previously described).
 Whether the detectives' conduct in other, unspecified
incidents should be made known to the jury had been the subject of
disagreement prior to trial. In resolving an in limine motion to
suppress filed by Murphy, the district court had concluded, over
objections based on relevance and prejudice, that the government
could offer evidence of the detectives' general practice of
falsifying warrants and not reporting cash, but that evidence as to
specific instances must be confined to the two incidents involving
Murphy. When the general practice evidence was offered at trial,
Murphy says that he made an adequate hearsay objection and that the
court rejected the objection, relying on the co-conspirator
exception.
 As it happens, the bulk of Brazil's "instruction"
evidence in question was not hearsay at all. Hearsay is an out-of-
court statement offered as evidence of the truth of the matter
asserted therein, Fed. R. Evid. 801(c); and while Brazil certainly
testified to statements made by the detectives out of court, those
statements--namely, the instructions given to Brazil to falsify
applications and withhold information about seizures--were not
offered for the truth of the matter asserted but rather to show
that the detectives gave such instructions. For the most part, the
out-of-court statements in question were simply directions (e.g.,
to make false statements in the warrant applications) and not
statements of fact at all. 
 Murphy objects that the statements were not "verbal acts" 
(e.g., the "I accept" that shows that an agreement has been
formed), but that is beside the point. Verbal acts are simply one
example among many of out-of-court statements offered for something
other than their truth. So long as out-of-court statements are
not offered for their truth, they are not hearsay, see Gutierrez-
Rodriguez v. Cartagena, 882 F.2d 553, 575 (1st Cir. 1989); it is
unnecessary to fit such statements into one particular category,
like verbal act, although this is often done, primarily as a short-
hand way of explaining the non-hearsay purpose for which the
statement is offered.
 Here, Brazil's testimony as to what the other detectives
told him to do showed that the detectives' method of operation was
to use false warrant applications and not to report seized cash. 
Such evidence tended to support other evidence from Brazil that the
detectives took similar steps in the two episodes in which Murphy
was involved and this, in turn, was pertinent to showing Murphy's
role in the two extortion efforts growing out of the two seizures. 
Whether or not the proof of general practice was more prejudicial
than probative is a different issue raised in the district court
but not here pursued by Murphy. Nor does Murphy appear to have
claimed that the testimony was character evidence restricted by
Fed. R. Evid. 404(a).
 Since the out-of-court statements just described were not
hearsay, why then did the district court make a Petrozziello
finding at all? The main answer is that other out-of-court
statements by Acerra and Robinson, concerning the very episodes at
issue in Murphy's trial, were (or arguably were) offered for their
truth. Those statements were thus hearsay and so inadmissible
against Murphy (absent some other exception) unless the district
court found that Murphy was part of a conspiracy and that the
statements were made by a fellow conspirator (Acerra or Robinson)
during and in furtherance of the conspiracy. This hearsay label is
most easily applied to the next piece of testimony objected to by
Murphy on this appeal. 
 Specifically, Brazil testified that at the police station
on the night of the Edgemere Road search, he heard Robinson say
that he knew Machore's attorney (i.e., Murphy) and "words to the
effect that `I know the attorney, I'll talk to him, we can work
this out,' words to that effect." Robinson's statement--seemingly
pure hearsay--that he knew Murphy helped explain Murphy's early
appearance as a go-between; whether the balance of the sentence,
expressing Robinson's intention to have a discussion with Murphy,
would be subject to a hearsay objection depends on how one
interprets the state of mind exception, Fed. R. Evid. 803(3), and
associated case law. In all events, admissibility of at least part
of the full statement depended on the Petrozziello finding. 
 This brings us to Murphy's dual attack on the
Petrozziello finding. On the factual side, Murphy's argument is in
substance that the district judge confused two different
conspiracies, the broad continuing conspiracy (from 1990 through
1996) between Acerra and Robinson to commit unlawful seizures and
keep the proceeds and the narrower extortion conspiracy (from May
through September of 1992) to which Murphy was a party. The
distinction matters: statements made solely in the course of the
former would not be admissible against Murphy under the co-
conspirator exception because (according to the government) Murphy
never became a member of that conspiracy. Fed. R. Evid.
801(d)(2)(E); United States v. Ciampaglia, 628 F.2d 632, 638 (1st
Cir. 1980); Petrozziello, 548 F.2d at 23.
 This charge builds on an ambiguity in the district
court's own statements. After the verdict, the district court
found, as required by Petrozziello, that "there was a specific
conspiracy between Mr. Murphy, Mr. Robinson, and Mr. Acerra to
obtain money through means of extortion" and "conspiratorial
preparation and conspiratorial coverup . . . ." But in explaining
the import of the finding, the district court used words arguably
suggesting that the finding supported not only the admission of
out-of-court statements made by Robinson and Acerra during the
extortion conspiracy but also some made before the extortion
conspiracy's formation.
 Of course, the co-conspirator exception operated against
Murphy only as to statements made during a conspiracy of which he 
was a member (although they could have been made before he joined,
see United States v. United States Gypsum Co., 333 U.S. 364, 393
(1948); United States v. Goldberg, 105 F.3d 770, 775-76 & n.1 (1st
Cir. 1997)). The government does not claim to have proved that
Murphy was ever a member of the broader conspiracy and, indeed,
early in the case disclaimed any such intention. Thus, to the
extent that the detectives made out-of-court statements before the
extortion conspiracy began, they could not be offered against
Murphy for their truth. If the district court thought otherwise
(which we very much doubt), it was mistaken.
 But the mistake, if there was one, had no consequence. 
The detectives' general practice of false warrant applications and
unreported cash seizures was proved, as already noted, by Brazil's
non-hearsay testimony as to the instructions he was given. If
somewhere in Brazil's testimony there was also some real hearsay to
the same effect--and none is clearly identified by Murphy--it was
duplicative and harmless. Nor does Murphy try to identify any
other specific out-of-court statements of the two detectives, not
made during the narrower extortion conspiracy, that were admitted
against him for their truth.
 This brings us to Murphy's procedural attack on the
Petrozziello finding. The finding, clearly necessary for admission
of hearsay statements of the detectives made during the extortion
conspiracy, was rendered by the trial judge after the jury verdict. 
Indeed, prior to jury deliberations, the district judge told
counsel that the finding would be made after the verdict, by which
time the judge would have had an opportunity to review the trial
evidence. This delay, says Murphy, was error and should invalidate
the finding (and evidence admitted pursuant to it) because this
court's precedent allegedly requires the finding before the case
goes to the jury. See Ciampaglia, 628 F.2d at 638.
 Well, yes and no. The case law in this circuit
anticipates that the finding will be made after all of the evidence
is in but before the case goes to the jury. The case law
explicitly provides that the Petrozziello finding should be based
on all of the evidence, see Ciampaglia, 628 F.2d at 638, which
explains why the judge must wait until all parties have presented
their cases. And, of course, trial counsel normally need to know,
before they sum up and argue about the evidence to the jury,
whether the evidence to be considered by the jury in its
deliberations will include hearsay statements provisionally
admitted (in the expectation that "all" of the evidence may lead to
an affirmative Petrozziello finding). 
 But we are confident from reading the transcript that
defense counsel knew before closing arguments that the jury was
going to be allowed to consider the co-conspirator hearsay
statements in its deliberations. In all likelihood, the district
court assumed that counsel understood that the statements were now
to be treated as admitted--since the jury, having heard the
testimony, was not being told to disregard it--and that the court
was postponing its formal finding so that it could review the trial
evidence at greater leisure. This, in turn, would permit the
district court more easily to bolster its finding with specific
record references.
 An explicit Petrozziello finding, before the case goes to
the jury, is surely the better practice (absent very unusual
circumstances). But if there was any doubt in defense counsel's
mind as to the evidence properly subject to closing argument and
jury consideration, counsel should have asked for a ruling by the
court. Here, no such inquiry was made when the district court
said that it was postponing its formal finding. And, when the
prosecutor in closing argument relied explicitly on an arguable
hearsay statement previously recounted (the "we'll work something
out" colloquy), defense counsel did not object. Of course, the
district court would have faced some difficulty if its post-verdict
review of the record had persuaded it to come out the other way on
its formal Petrozziello finding, but that interesting problem did
not arise.
 We turn now to Murphy's second, and quite different,
ground of appeal. At sentencing, the district court refused
Murphy's request to adjust his offense level downward to reflect
his claim that he had played only a "minor" or "minimal" role in
the offense. U.S.S.G. 3B1.2. This is normally a fact-bound
decision, reviewed only for clear error and rarely reversed. See,
e.g., United States v. Mateo-Sanchez, 166 F.3d 413, 417 (1st Cir.
1999); United States v. Gonzalez-Soberal, 109 F.3d 64, 73 (1st Cir.
1997). However, in denying the adjustment, the district court said
the following:
 Now, turning to the question of
 adjustment for role in the offense, I don't
 want to spend too much time on that. I view
 the role that Mr. Murphy had to be not a minor
 role, not a minimal role. It's really at the
 core of what goes on in these kinds of
 transactions. There is a middle man. Mr.
 Murphy was found to be that middle man. I
 find it to be shown to a fair preponderance of
 the evidence that he was. I do not find any
 basis for adjusting the role in the offense.

 Murphy now argues that the district court denied the
adjustment on the premise, mistaken as a matter of law, that
middlemen in extortion schemes are automatically disqualified from
minor or minimal role adjustments. He invokes cases where
appellate courts have reversed because they thought that such a
categorical approach had been used in lieu of an assessment of the
defendant's specific actions; for example, in one case, the
sentencing judge used language suggesting to the appeals court that
he thought the adjustment was always and forever unavailable to
drug couriers regardless of circumstances. See United States v.
Campbell, 139 F.3d 820, 821-22 (11th Cir. 1998); see also United
States v. Donaldson, 915 F.2d 612, 615 (10th Cir. 1990).
 The line between categorical and case specific refusals
to decrease offense levels is more blurred than most courts
acknowledge because descriptive terms, applied to individuals, are
themselves categories (e.g., drug courier; middle man). What is
needed, if sentencing judges are not to be forced to read
boilerplate from scripts, is use of common sense in determining
what the judge meant. Here, we think that the district court
meant only that Murphy as the middle man played a central part in
this extortion scheme; and we are sure, or at least sure enough to
eschew a remand, that the court was not expressing a per se rule
disqualifying every "middle man" in an extortion scheme from 
showing that his role in the case at hand was in fact minor or
minimal.
 Murphy also refers us to the statements in the guideline
commentary that the minimal role adjustment is "intended to cover
defendants who are plainly among the least culpable of those
involved" in a group crime, U.S.S.G. 3B1.2, comment. (n.1), and
that the minor role adjustment is available for one "who is less
culpable than most other participants" but whose role was not
"minimal." Id., comment. (n.3). However, this language has not
been read to make the "least" or "less" culpable person in a given
group crime automatically entitled to the adjustment. See United
States v. Royal, 100 F.3d 1019, 1030 (1st Cir. 1996); United States
v. Ocasio, 914 F.2d 330, 332-33 (1st Cir. 1990).
 Rather, the defendant must be less culpable than the
ordinary average participant in such crimes and not just relative
to those with whom he perpetrated the crime. See United States v.
Nunez-Rodriguez, 92 F.3d 14, 24 (1st Cir. 1996); Ocasio, 914 F.2d
at 332-33. Otherwise, a substantial participant might get an
adjustment just for being less important than others. Given the
knowing and important role played by Murphy here, it was not clear
error to deny him the adjustment.
 Murphy's next objection to his conviction is that the
prosecutor offered leniency in state proceedings to Machore and
other witnesses against Murphy, as well as unidentified 
"immigration assistance." The objection, made in a motion for a
new trial that the district court denied, was based on the Tenth
Circuit's later discarded decision in United States v. Singleton,
144 F.3d 1343 (10th Cir. 1998), vacated, 165 F.3d 1297, 1298 (10th
Cir. 1999) (en banc), cert. denied, 119 S. Ct. 2371 (1999),
treating leniency and other benefits as "a thing of value" offered
to a witness in violation of 18 U.S.C. 201(c)(2). Although
Murphy understands that the original Singleton decision was
overturned in its own circuit and widely disapproved of elsewhere,
see United States v. Ramsey, 165 F.3d 980, 986-87 (D.C. Cir. 1999)
(collecting cases), he urges on us a more limited version of
Singleton.
 Murphy argues that it is one thing for the prosecutor to
offer an implicated co-defendant a plea bargain in the case at hand
and altogether different and less defensible to offer to help the
defendant in unrelated state criminal proceedings or to offer
immigration assistance (presumably, help in avoiding deportation or
regularizing a doubtful status). The former, says Murphy, may now
be permitted, if section 201(c)(2) is glossed by relying on other
statutes and past practice; but the latter should still be
forbidden as outside the gloss or else the prosecutor could just
pay witnesses money for their testimony. Murphy points to language
supporting his distinction in two different cases, United States v.
Singleton (Singleton II), 165 F.3d 1297, 1303-08 (10th Cir. 1999)
(en banc) (Luccro, J. concurring), and United States v. Medina, 41
F. Supp.2d 38, 42 (D. Mass. 1999).
 After Murphy filed his brief in this court, another panel
decided United States v. Lara, 181 F.3d 183, 197 (1st Cir. 1999),
whose "explicit and unqualified" holding is "that section 201(c)(2)
does not apply at all to the federal sovereign qua prosecutor." 
That decision, which governs this panel, Williams v. Ashland Eng'g
Co., Inc., 45 F.3d 588, 592 (1st Cir. 1995), cert. denied, 516 U.S.
807 (1995), disposes of Murphy's narrower argument. We add that
independent of section 201(c)(2), there are surely outer limits on
what a prosecutor can do in offering benefits to a witness. But
even without Lara, we would not be inclined to view leniency in
state proceedings or forestalling deportation as markedly different
in character or consequence than a lesser sentence or no
prosecution at all in the case at hand.
 Murphy's final argument on the merits of his conviction
is that the evidence in support of one of the counts--the charge of
extorting money from Machore following the May 6 arrests--did not
establish the necessary link to interstate commerce. This count,
which involved actual extortion of money the Boston Police
Department handed over to Murphy, required the government to prove
that Murphy participated or assisted in extortion that "in any way
or degree obstruct[ed], delay[ed], or affect[ed] [interstate]
commerce or the movement of any article or commodity in
[interstate] commerce . . . ." 18 U.S.C. 1951(a). The
"commerce" requirement is the basis for Congress's power to
criminalize the conduct under the Constitution. See Stirone v.
United States, 361 U.S. 212, 218 (1960).
 Murphy argues that the government's commerce showing
rested on the theory that the money diverted from the Boston Police
Department to Murphy would otherwise have been available to the
police to purchase articles in interstate commerce. Murphy agrees
that it is enough that money is diverted from a pool of funds that
is otherwise used (at least in part) to purchase goods that flow in
interstate commerce. United States v. DiGregorio, 605 F.2d 1184,
1190-91 (1st Cir.), cert. denied, 444 U.S. 944 (1979). But he says
that in this case the drug proceeds seized in the taxi search
would, if retained by the police, have been available under state
law only for limited purposes and not for general "operating
needs." Mass. Gen. Laws ch. 94C, 47(d). 
 At trial, the government offered evidence that in the
year the extortion occurred, the Boston Police Department made
substantial purchases of goods and services in interstate commerce. 
In response to Murphy's argument, the government says that state
law on its face generously permits use of forfeited drug funds for
"protracted investigations, to provide additional technical
equipment or expertise . . . or to accomplish such other law
enforcement purposes" as the police deem fit. Id. Given the
breadth of this statutory language and the proof that the police
did buy goods and services interstate, we agree that a rational
jury could find the minimal effect needed for the jurisdictional
showing. United States v. Olbres, 61 F.3d 967, 970 (1st Cir.
1995).
 Apparently there was no specific evidence that the
restricted funds were in fact used for interstate purchases (even
though they could have been so used). But even assuming that this
was beyond the jury's power to infer--a point we need not decide--
the diversion of forfeited funds could hardly help but constrain
the availability of operating funds at least in some minimal
degree; and little is needed to satisfy the very low jurisdictional
threshold. DiGregorio, 605 F.2d at 1190-92. We therefore need not
consider the government's other and quite independent theories of
how the extortion scheme affected commerce, offered as alternative
grounds for upholding the verdict.
 Affirmed.