<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 97-2215

                   UNITED STATES OF AMERICA,

                           Appellee,

                               v.

                         GIOVANNI LARA,

                     Defendant, Appellant.

No. 97-2223

                   UNITED STATES OF AMERICA,

                           Appellee,

                               v.

                       GEORGE SEPULVEDA,

                     Defendant, Appellant.

                     _____________________

No. 97-2224

                   UNITED STATES OF AMERICA,

                           Appellee,

                               v.

                         TERRENCE BOYD,

                     Defendant, Appellant.
                     ______________________

No. 97-2225

                   UNITED STATES OF AMERICA,

                           Appellee,

                               v.

                         SHARIFF ROMAN,

                     Defendant, Appellant.
                     _____________________

No. 97-2226

                   UNITED STATES OF AMERICA,

                           Appellee,

                               v.

                         GEORGE PERRY,

                     Defendant, Appellant.
                     _____________________

No. 97-2227

                   UNITED STATES OF AMERICA,

                           Appellee,

                               v.

                         ERYN VASQUEZ,

                     Defendant, Appellant.
                     _____________________

         APPEALS FROM THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF RHODE ISLAND

            [Hon. Mary M. Lisi, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
               Kravitch,* Senior Circuit Judge,
                  and Lipez, Circuit Judge.
                                
                                
                                

    Valeriano Diviacchi, with whom Diviacchi Law Office was on
brief, for appellant Lara.
    Malcolm J. Barach for appellant Sepulveda.
    Larry J. Ritchie, with whom Edward L. Gerstein was on brief,
for appellant Boyd.
    R. Scott Miller, Jr. for appellant Roman.
    R. Scott Miller, Jr.  with whom Richard J. Shea was  on brief,
for appellant Perry.
    Pedro A. Jaile for appellant Vasquez.
    Lisa Simotas, Attorney, Dep't of Justice, with whom Margaret
E. Curran, United States Attorney, Gerard B. Sullivan, and Terrence
P. Donnelly, Assistant United States Attorneys, were on brief, for
the United States.

June 30, 1999

__________
*Of the Eleventh Circuit, sitting by designation.

 SELYA, Circuit Judge.  A federal grand jury indicted a
coterie of defendants, including the six appellants (Giovanni "King
G" Lara, George "King Paradise" Sepulveda, Terrence "King Bullet"
Boyd, Shariff "King Biz" Roman, George "King Animal" Perry, and
Eryn "King Guy" Vasquez) for a multiplicity of crimes arising out
of their involvement in the Providence chapter of the Almighty
Latin King Nation.  Following a 44-day trial, each appellant was
convicted on one or more of the following charges:  racketeering,
18 U.S.C.  1962(c); conspiracy to commit racketeering, id.  
1962(d); violent crime in aid of racketeering (including two
murders and two attempted murders), id.  1959(a)(1) & (5);
carjacking, id.  2119(3); witness intimidation, id.  1512(b); use
or carriage of a firearm during a crime of violence, id.  924(c);
and being a felon in possession of a firearm, id.  922(g).  The
district court sentenced five of the appellants to life
imprisonment and the sixth, Vasquez, to 100 months in prison.  
These appeals followed.  We affirm.
I.  BACKGROUND
 We offer a thumbnail sketch of the interrelationship
between the appellants and the Latin Kings, taking the information
contained in the record in the light most congenial to the jury's
verdict.  See United States v. Houlihan, 92 F.3d 1271, 1277 (1st
Cir. 1996).  We eschew an exposition of the other evidence,
preferring to discuss that evidence in the body of the opinion as
it pertains to our consideration of particular points raised by the
appellants.
 The Latin Kings originated in Chicago in the 1940s.  Over
time, the street gang's influence spread to other venues.  The
movement  migrated east to Providence in the early 1990s.  Though
some chapters  of the Latin Kings, called Charter Nations, require
Hispanic descent as a condition of membership, others (like the
Providence chapter) allow persons of all races and ethnicities to
join.
 Members of the Latin Kings signal their affiliation by
sporting beads and other accouterments (including tattoos) in the
gang's colors   black and gold.  They pay dues, attend weekly
meetings, and undertake "missions" (a euphemism that covers an
array of activities ranging from running errands to committing
violent crimes) when directed by gang leaders.  Respect and
security rank among the gang's paramount concerns:  the Latin Kings
routinely discipline members for disrespectful behavior or for
discussing Latin King business with outsiders.  Discipline runs a
lengthy gamut from the "silent treatment" (suspension of all
communications with other gang members), to revocation of drug use
privileges, to a "bounce" (a time-controlled beating limited to
certain areas of the body), to death.
 The Almighty Latin King Nation is a hierarchical
organization, and each of the appellants held one or more
leadership positions within the Providence chapter.  Sepulveda
served as the group's president (sometimes called "Inca").  Boyd
served as the vice-president (sometimes called "Cacique"), and
later succeeded Sepulveda as president.  Roman served as the chief
enforcer (a position previously held by Lara and subsequently held
by Perry), and replaced Boyd as vice-president.  Vasquez functioned
as the group's philosopher and then graduated to the post of
investigator.
 Against this backdrop, we proceed to survey the
appellants' assignments of error.  We start with two issues
pertaining to jury selection and then treat three of the trial
court's evidentiary rulings.  At that juncture, we address a series
of Rule 29 claims.  Finally, we tackle a perceived problem with the
jury instructions.  To the extent that the appellants mount other
claims, we reject them out of hand, without elaboration.
II.  JURY SELECTION ISSUES
 Most of the appellants join in two challenges related to
jury selection:  all save Perry argue that the jury pool was not
composed of a fair cross-section of the community, and all
calumnize the prosecution's use of a peremptory challenge to strike
an African-American prospective juror.  We find no merit in either
of these assigned errors.
               A.  The Fair Cross-Section Claim.
 The Constitution affords a criminal defendant the right
to a trial "by an impartial jury of the State and district wherein
the crime shall have been committed."  U.S. Const. amend. VI.  This
constitutional command requires that juries be selected from a
representative cross-section of the community.  See Duren v.
Missouri, 439 U.S. 357, 358-59, 363-64 (1979); Taylor v. Louisiana,
419 U.S. 522, 528 (1975).  Congress codified that requirement in
the Jury Selection and Service Act, (JSSA), 28 U.S.C.  1861.  The
appellants assert that the venires from which the district court
selected both their grand and petit juries defied this imperative.  
We do not agree.
 The appellants base their assertion on Rhode Island's
failure to comply with the National Voter Registration Act (NVRA),
42 U.S.C.  1973gg to 1973gg-10 (1994).  This statute, known
colloquially as the motor voter law, took effect in Rhode Island on
January 1, 1995.  It requires states to accept voter registration
applications in tandem with applications for drivers' licences and
other permits, and to establish procedures to facilitate that
process.  See id.  1973gg-2(a), 5(a).  Rhode Island has conceded
that it did not fully comply with the NVRA.  See League of Women
Voters v. Rhode Island Bd. of Elections, No. 96-442ML (D.R.I. Sept.
12, 1996) (consent decree).  Because the District of Rhode Island
derives its jury wheel from the state's voter registration lists,
see In re Amended Juror Selection Plan, Misc. No. 75-209 (D.R.I.
Oct. 6, 1993), the appellants claim that this noncompliance
rendered the District's jury venires unrepresentative and
transgressed both the Sixth Amendment and the JSSA.
 This claim is fully preserved with respect to the five
appellants who proffer it here.  Although only Sepulveda and Boyd
moved to dismiss the indictment on this basis, the district court
permitted Lara, Roman, and Vasquez to adopt Sepulveda's and Boyd's
position.
 Though preserved, the claim is unavailing.  In order to
establish a fair cross-section violation under either the Sixth
Amendment or the JSSA, a criminal defendant must make a tripartite
showing comprising cognizability (i.e., that the group alleged to
be excluded is a distinctive group), underrepresentation (i.e.,
that the group is not fairly and reasonably represented in the
venires from which juries are selected), and systematic exclusion
(i.e., that the discerned underrepresentation is due to the group's
systematic exclusion from the jury-selection process).  See Duren,
439 U.S. at 364; United States v. Royal, ___ F.3d ___, ___ (1st
Cir. 1999) [1999 WL 179003, at *4].  Assuming, arguendo, that the
appellants have made the first of these three showings, they
plainly have failed to satisfy either the second or third part of
the test.  Because the Duren test is conjunctive   the proponent of
a fair cross-section claim must satisfy all three of its elements
 either of these failings suffices to defeat the instant claims.
 We start with underrepresentation.  A showing of
underrepresentation must be predicated on more than mere guesswork.  
Such a showing requires competent proof (usually statistical in
nature).  See, e.g., Duren, 439 U.S. at 364-65; United States v.
Pion, 25 F.3d 18, 22-23 (1st Cir. 1994); see also United States v.
Hafen, 726 F.2d 21, 23-24 (1st Cir. 1984) (considering the
statistical methodologies that might be used to determine
underrepresentation and selecting the absolute disparity method).  
The single supporting document filed in the district court in
connection with the appellants' motions to dismiss was an affidavit
attesting to the legislative history and purposes of the NVRA, and
the genesis of the consent decree.  This affidavit does not supply
any foundation for a finding that the representation of Hispanic
venirepersons in the District was unfair, unreasonable, or in any
way disproportionate to their numbers in the community.
 A successful fair cross-section claim also requires
competent proof of the systematic nature of the exclusionary
mechanisms leading to the underrepresentation.  See Duren, 439 U.S.
at 366-67; Royal, ___ F.3d at ___ [1999 WL 179003, at *4].  The
supporting affidavit in this case offers no reason to believe that
any systematic exclusion of Hispanics occurred in the selection
process, let alone that it caused any material underrepresentation.  
The NVRA is addressed to heightening overall popular participation
in federal elections, as well as to increasing voter registration
by members of racial minorities.  See 42 U.S.C.  1973gg.  The
naked fact of Rhode Island's noncompliance with the statute
provides no insight into whether voter registration lists (and,
therefore, the jury wheel compiled from those lists) were skewed
for or against minorities if skewed at all.  Since the appellants'
proffer does not identify any systemic shortcoming or operational
deficiency that would tend to lessen Hispanic representation in the
master jury wheel disproportionately, it does not satisfy the third
part of the Duren test.  See Pion, 25 F.3d at 22-23.
 It follows inexorably from what we have said that the
district court did not err in rejecting the pretrial motions to
dismiss the indictment for want of a fair cross-section.
                   B.  The Batson Challenge.
 The appellants unanimously claim that the prosecution
impermissibly used a peremptory challenge to banish a prospective
juror, Bruce King, because of his race.  We rehearse the events
that undergird this complaint.
 Relatively late in the voir dire process, King, a black
male, was tentatively seated.  The district judge, the prosecutor,
and several defense attorneys proceeded to question him.  
Sepulveda's lawyer noted that the evidence would include allusions
to racial epithets and mention of the fact that many Latin King
chapters did not welcome African Americans.  He then asked whether
such testimony might affect King's ability to decide the case.  
King replied, "I believe I can be a fair and impartial juror under
any circumstance."  Upon hearing this declaration, Perry began to
applaud.  The court silenced him and the voir dire continued.  When
the defense team had completed its interrogation of King, the
prosecutor asked that Perry's effusion be placed on the record.  He
then queried King as to whether the applause made him
uncomfortable.  King responded in the negative, explaining that he
did not know why Perry felt impelled to clap.
 Because the prosecutor's questions suggested a concern
over whether the incident would jeopardize King's ability to render
an impartial verdict, Roman's counsel requested an opportunity to
discuss the matter.  He debunked the notion that King had been
compromised and emphasized that King was one of very few potential
black jurors who might be eligible for service in the case    
perhaps the only one.  Judge Lisi permitted King to leave for the
day and reprimanded Perry, warning him that another outburst would
result in his removal from the courtroom.  The dialogue between the
court and counsel then resumed.  The prosecutor summarized his
position and speculated that "[i]f we can find other black jurors
in the panel to sit," he might use a peremptory strike to eject
King from the jury.  The day's proceedings ended without resolving
the issue of King's continued service.
 The next day, the prosecutor moved to excuse King for
cause and the parties argued the point.  The district judge took
the matter under advisement overnight.  She ultimately denied the
motion, explaining:
   On the record, that is, taking Mr. King's
 statements at face value as I do, I do not
 believe that cause exists to remove him from
 this panel.  . . .  [I]t appears from what I
 observed here in the courtroom and what
 occurred on the record afterwards with the
 colloquy between the Government and Mr. King,
 that Mr. King was not affected by Mr. Perry's
 action.

 When the time arrived for the parties to exercise their
peremptory strikes, the government challenged King.  The appellants
branded this strike race-based and violative of the Equal
Protection Clause.  After hearing argument, the district court
overruled their objections.  Because this decision resolves a mixed
question of law and fact that is peculiarly fact-sensitive, we
review it for clear error.  See United States v. Bergodere, 40 F.3d
512, 516 (1st Cir. 1994).
 It is by now common ground that race is an
unconstitutional proxy for juror competence and impartiality, and,
therefore, that criminal defendants have an equal protection right
to jury selection procedures that are free from racial biases.  See
Powers v. Ohio, 499 U.S. 400, 404 (1991); Batson v. Kentucky, 476
U.S. 79, 89 (1986); Bergodere, 40 F.3d at 515.  We have directed
the use of a three-part framework to aid in assessing the validity
of an allegation that the prosecution stooped to employ a race-
based peremptory strike.  See Bergodere, 40 F.3d at 515 (citing,
inter alia, Batson, 476 U.S. at 96-98).  This framework envisions
that:
   [T]he defendant must make a prima facie
 showing of discrimination in the prosecutor's
 launching of the strike.  If the defendant
 fulfills this requirement by establishing,
 say, a prima facie case of a racially driven
 impetus, then the prosecutor must proffer a
 race-neutral explanation for having challenged
 the juror. . . .  If the prosecutor complies,
 then, at the third and final stage, the
 district court must decide whether the
 defendant has carried the ultimate burden of
 proving that the strike constituted purposeful
 discrimination on the basis of race.

Id. (citations and footnote omitted).  In deploying this framework,
the prosecutor's second-step burden of proffering a race-neutral
explanation for the strike "is merely a burden of production, not
a burden of persuasion," and the defendant retains the devoir of
persuasion throughout the course of the inquiry.  Id.
 In this case, we can truncate the usual inquiry.  In the
district court, as here, the government tacitly acknowledged that
the defendants had (or could have) offered a prima facie showing
that the strike appeared discriminatory.  Thus, the first step of
the pavane need not detain us.  See Hernandez v. New York, 500 U.S.
352, 359 (1991).
 At the second step, the government must advance a race-
neutral explanation for its peremptory challenge.  In an effort to
meet this requirement, the prosecutor pointed to Perry's applause,
theorizing that Perry might have been trying either to create an
affinity with King or to intimidate him.  In either event, the
prosecutor stated, he feared that King's impartiality would wane,
particularly after King learned of the atrocities that the
government ascribed to Perry and his confederates.  Although the
appellants contended that this explanation was bogus, the district
judge accepted it.  King was excused, and the empanelment
continued.  When sworn, the jury included one juror who described
himself as Mexican and one who appeared non-Caucasian (but from
whom no racial information was elicited).
 We discern no clear error in Judge Lisi's ruling.  In
order to meet the second-step requirement, a prosecutor's
explanation need only be unrelated to race on its face.  At this
point, neither the persuasiveness of the explanation nor the
credibility of the prosecutor is at issue.  See Purkett v. Elem,
514 U.S. 765, 768-69 (1995) (per curiam); Hernandez, 500 U.S. at
360.  Perry's clearly inappropriate courtroom behavior and its
potential effect on King's ability to serve as a juror are in no
way related to race, and, thus, the proffered reason crosses this
modest threshold.  See, e.g., Purkett, 514 U.S. at 769 (finding
prosecutor's explanation that strikes of black jurors were based on
beards and long, unkempt hair to be race-neutral for purposes of
the second Batson way station).
 This leaves the third, and final, determination:  whether
the appellants have proven that the strike constituted racial
discrimination.  This decision boils down to whether the appellants
have convinced the district court that the race-neutral explanation
furnished by the government rings hollow.  Because the question is
intensely fact-driven and the answer often pivots on credibility,
appellate tribunals must scrutinize the trial court's response
under a highly deferential glass.  See Hernandez, 500 U.S. at 364-
65; Batson, 476 U.S. at 98 n.21.
 In this case, the trier credited the government's
explanation:
   I have heard the explanation of the Government
 and I have observed [the prosecutor's]
 reaction to Mr. Perry's applause.  And I
 cannot say that [the prosecutor's] challenge
 here is based on race.  [His] challenge is
 based, as he says, on conduct and on the
 concern that he has   and quite frankly, that
 the Court has   as to what effect Mr. Perry's
 misbehavior would have on Juror King . . . .

The judge also noted that she had observed no pattern of
discrimination in the government's use of its peremptory challenges
 a fact that may be entitled to special weight in determining
whether a prosecutor's race-neutral explanation for a peremptory
challenge is pretextual.  See Hernandez, 500 U.S. at 363.
 The appellants urge us to hold that Judge Lisi committed
clear error in upholding the prosecutor's strike.  They assert that
she misunderstood the applicable legal standard, but the record
belies this ipse dixit.  They also harp on the prosecutor's earlier
statement that he might consider exercising a peremptory challenge
against King if other black jurors were empaneled.  This statement,
the appellants say, suggests that the government in certain
circumstances would have left King on the jury solely because he
was black, thus proving that the prosecutor had race in mind and
deliberately injected it into the jury-selection calculus.  While
we do not defend the prosecutor's comment (which was both
insensitive and unfortunate), we find no clear error in the
district court's conclusion that the prosecutor's remark did not
discredit his race-neutral explanation.  See Cumpiano v. Banco
Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990) (explaining that
no clear error exists unless review "on the whole of the record"
generates "a strong, unyielding belief that a mistake has been
made").
 The governing principle, of course, is that a person's
race must be regarded as "unrelated to his fitness as a juror."  
Batson, 476 U.S. at 87.  Here, the record makes manifest that Judge
Lisi took this principle fully into account, and her resolution of
the issue of pretext based on her assessment of the prosecutor's
demeanor and credibility cannot be disturbed.  Perry's paroxysm
injected an imponderable into the equation.  Trial lawyers
understandably fear the unknown, and that fear, in itself, is not
indicative of a race-based viewpoint.  When the prosecutor voiced
this sort of concern, the district judge was well-situated to
assess his candor.  The judge did so here   and we will not second-
guess her assessment.  After all, when the evidence gives rise to
competing interpretations, each plausible, the factfinder's choice
between them cannot be clearly erroneous.  See Smith v. F.W. Morse
& Co., 76 F.3d 413, 423 (1st Cir. 1996); Johnson v. Watts Regulator
Co., 63 F.3d 1129, 1138 (1st Cir. 1995).
III.  EVIDENTIARY ISSUES
 The appellants level a number of criticisms relating to
the admission of evidence.  Only three of these criticisms warrant
discussion.
                  A.  Coconspirator Testimony.
 Boyd disputes the district court's admission of certain
videotaped statements under Fed. R. Evid. 801(d)(2)(E).  We sketch
the circumstances.
 The government played videotapes for the jury during the
trial.  These videotapes had been secured with the cooperation of
a confidential informant, Jose Ortiz, at whose home Latin King
meetings sometimes were held.  The videotape about which Boyd
complains includes a solitary mention of him by Roman while
discussing how Mendez's murder came about.  Boyd contemporaneously
objected to the admission of this evidence against him on the
ground that it fell outside the scope of Rule 801(d)(2)(E).  He
also seasonably requested an instruction limiting the jury's
consideration of the evidence to other defendants.  The trial judge
overruled the objection, admitted the evidence unconditionally, and
declined to give the requested limiting instruction.
 We review challenges to the admission of evidence for
abuse of discretion.  See Williams v. Drake, 146 F.3d 44, 47 (1st
Cir. 1998).  On this basis, Boyd's challenge stumbles at the
starting gate.  His argument addresses the admissibility of the
evidence solely in respect to the only charge on which the jury
found him guilty   the murder-in-aid-of-racketeering charge.  But
Boyd was also tried on (albeit not found guilty of) racketeering
and racketeering conspiracy charges under the Racketeer Influenced
and Corrupt Organizations Act (RICO), 18 U.S.C.  1962, and he
concedes that the tape was admissible against him vis--vis those
charges.
 This concession is dispositive, for the designation of a
declaration as non-hearsay under Rule 801(d)(2)(E) is neither
count-specific nor conspiracy-specific.  See United States v.
Innamorati, 996 F.2d 456, 486 (1st Cir. 1993).  Subject to
relevancy and similar considerations, out-of-court statements of a
declarant coconspirator, if made during and in furtherance of a
conspiracy, are admissible for the truth of the matter asserted,
regardless of whether the conspiracy furthered is charged or
uncharged, see United States v. Candelaria-Silva, 162 F.3d 698, 706
(1st Cir. 1998); United States v. Rivera, 68 F.3d 5, 7 (1st Cir.
1995), and regardless of whether it is identical to or different
from the crime that the statements are offered to prove, see
Innamorati, 996 F.2d at 486.  Hence, the trial court did not abuse
its discretion in overruling Boyd's objection.
 We think that the court also appropriately refused Boyd's
request for a limiting instruction.  When the government proffered
the videotape, Boyd requested an instruction that "the jury c[ould]
not consider the statements of Shariff Roman as substantive
evidence or proof that Boyd participated in the murder of Mendez."  
But the Mendez murder was not charged against Boyd merely as a
violent crime in aid of racketeering, 18 U.S.C.  1959(a)(1), but
also was charged as one of the predicate acts in the RICO count,
id.  1962(c).  As Boyd concedes, the challenged statements were
admissible non-hearsay evidence as to the latter count.  Thus, the
jury was entitled to consider the relevant portions of Roman's
statements on that count as to all the defendants (Boyd included).  
On this basis, the proposed instruction   which swept broadly
rather than asking narrowly that the jury disregard the statements
in respect to the separate charge that the murder was a violent
crime in aid of racketeering   would at best have been confusing,
and at worst, legally erroneous.  It is, of course, hornbook law
that a party cannot rewardingly assign error to a trial court's
refusal to give a confusing, misleading, or legally incorrect
instruction.  See United States v. DeStefano, 59 F.3d 1, 4 (1st
Cir. 1995); United States v. David, 940 F.2d 722, 738 (1st Cir.
1991).
 In all events, we need not linger over this point,
inasmuch as the videotape is not significantly inculpatory as to
Boyd's involvement in the commission of the Mendez murder.  The
only statement on the tape that relates to Boyd at all occurs when
Roman says that, at the time of the murder, "Bullet was, um, in
Training School still, you know what I mean?"  This statement, on
its face, is benign (perhaps exculpatory).  Still, in a feat of
linguistic legerdemain, the government construed this statement at
trial to mean that Boyd had escaped from the Training School, and
thus was available when the Latin Kings contrived the murder plot.  
Even if this odd interpretation is accepted, however, the statement
only showed that Boyd was available at the time of the Mendez
murder.  Since several percipient witnesses testified not only to
his availability, but also to his actual presence at the meetings
in which the Latin Kings planned Mendez's murder, any error in
refusing to give the requested instruction was harmless because
there was no "realistic possibility that admission of the evidence
influenced the outcome of the trial" as to Boyd's guilt on the
single count of conviction (commission of a violent crime in aid of
racketeering).  United States v. Polito, 856 F.2d 414, 420 (1st
Cir. 1988); cf. United States v. Ladd, 885 F.2d 954, 957-58 (1st
Cir. 1989) (finding erroneous admission of evidence harmless when
the evidence served only to prove a point well documented by other
evidence).
            B.  Testimony of Cooperating Witnesses.
 During the trial, the government offered the testimony of
several cooperating witnesses, who testified in return for promises
that they would not be charged federally for certain crimes and/or
for recommendations of lenient sentencing in respect to crimes for
which they had been or would be charged.  Five of the appellants
(Boyd excluded) insist that the lower court should have barred
these witnesses from testifying, and that its failure to do so
necessitates a new trial.
 The appellants pin their hopes on a witness-bribery
statute which provides in relevant part:
   Whoever . . . directly or indirectly, gives,
 offers or promises anything of value to any
 person, for or because of the testimony under
 oath or affirmation given or to be given by
 such person as a witness upon a trial,
 hearing, or other proceeding, before any court
 . . . authorized by the laws of the United
 States to hear evidence or take testimony . .
 . shall be fined under this title or
 imprisoned for not more than two years, or
 both.

18 U.S.C.  201(c)(2).  In mid-1998, a panel of the Tenth Circuit
interpreted this statute to forbid testimony given in exchange for
promised leniency, and applied an exclusionary rule to such
testimony.  See United States v. Singleton, 144 F.3d 1343 (10th
Cir. 1998) (Singleton I).  Since then, the federal courts have been
inundated with a flood of what have come to be called "Singleton
arguments," and we take the opportunity to dam this misguided
stream.
 Singleton I appears to us to be nothing more than an
aberration, and we reject its reasoning and result.  We use the
term "aberration" advisedly, because the opinion has been overruled
in the circuit of its birth, see United States v. Singleton, 165
F.3d 1297, 1298 (10th Cir. 1999) (en banc) (Singleton II), cert.
denied, ___ S. Ct. ___ [1999 WL 185874], and several other courts
of appeals have disavowed its anfractuous reading of section
201(c)(2), see, e.g., United States v. Lowery, 166 F.3d 1119, 1122-
24 (11th Cir. 1999); United States v. Ramsey, 165 F.3d 980, 987
(D.C. Cir. 1999); United States v. Ware, 161 F.3d 414, 418 (6th
Cir. 1998), cert. denied, 119 S. Ct. 1348 (1999); United States v.
Haese, 162 F.3d 359, 366-68 (5th Cir. 1998), cert. denied, ___ S.
Ct. ___ (1999) [1999 WL 241837].  We, too, have intimated as much.  
See United States v. Hernandez-Albino, ___ F.3d ___, ___ (1st Cir.
1999) [No. 98-1643, slip op. at 16] (holding that refusal to follow
Singleton I does not constitute plain error).  Today, we make our
position explicit and unqualified.
 There are several reasons why section 201(c)(2) cannot be
invoked as a bright-line barrier to the government's use of
witnesses whose cooperation has been secured by agreements not to
prosecute or by promises of recommended leniency.  The most basic
reason is that section 201(c)(2) does not apply at all to the
federal sovereign qua prosecutor.  Accord Ramsey, 165 F.3d at 987-
90; Haese, 162 F.3d at 366-67; Ware, 161 F.3d at 418-21.  After
all, "[s]tatutes of general purport do not apply to the United
States unless Congress makes the application clear and
indisputable," Singleton II, 165 F.3d at 1300, and Congress has
taken no such steps in respect to this statute.  Reliance on this
tenet is particularly apt where, as here, the failure to honor it
would divest the government of a long-established prerogative and,
in the bargain, lead to an eccentric result.  See Nardone v. United
States, 302 U.S. 379, 383 (1937).
 We add, moreover, that the Singleton I panel's reading of
section 201(c)(2) cannot be correct because such a reading would
preclude enforcement or limit the efficacy of the terms of several
more recent   and more specific   statutes, all of which presuppose
the potential use of testimony in exchange for non-prosecution
agreements, leniency recommendations, and/or other valuable
promises.  See, e.g., 28 U.S.C.  994(n) (authorizing the
Sentencing Commission to include in the sentencing guidelines a
mechanism by which courts may reduce sentences to account for
convicted defendants' substantial assistance); 18 U.S.C.  3521
(providing for government-subsidized relocation and protection of
witnesses in return for their testimony); 18 U.S.C.  6002, 6003
(allowing prosecutors to obtain orders compelling witnesses to
testify despite potential self-incrimination, in return for
immunity from prosecution based on that testimony).  These
enactments would be crippled, if not rendered utterly meaningless,
were we to follow the siren's call of Singleton I.  Courts
generally adhere to the principle that statutes relating to the
same subject matter should be construed harmoniously if possible,
and if not, that more recent or specific statutes should prevail
over older or more general ones.  See HCSC-Laundry v. United
States, 450 U.S. 1, 6 (1981); Morton v. Mancari, 417 U.S. 535, 550-
51 (1974); see also 2B Norman J. Singer, Statutes and Statutory
Construction  51.02-03 (1992).  There is no basis for eschewing
that time-tested principle in this instance.
 At the risk of carting coal to Newcastle, we briefly note
two other bases for disavowing Singleton I.  First, it is at least
arguable that section 201(c)(2) should not apply to the government
because the Dictionary Act, 1 U.S.C.  1, which creates a frame of
reference for parsing statutes, defines the word "whoever" to
include "corporations, companies, associations, firms,
partnerships, societies, and joint stock companies, as well as
individuals," but does not define the word to include the United
States.  Id.; see also Ramsey, 165 F.3d at 987.  Second, even if
section 201(c)(2) were applicable to the testimony of cooperating
witnesses, the appropriate penalty for the use at trial of
testimony obtained in derogation of the statute most likely would
be a fine or imprisonment (as prescribed by the statute itself),
not resort to a judicially-crafted exclusionary rule.  See United
States v. Condon, 170 F.3d  687, 689 (7th Cir. 1999); Ramsey, 165
F.3d at 991.
 We have said enough on this score.  We hold, without
serious question, that 18 U.S.C.  201(c)(2) does not bar the
government from promising leniency or the like to cooperating
witnesses.  Accordingly, the district court did not err in
admitting the contested testimony.
                C.  Scope of Cross-Examination.
 Perry, who testified at trial in his own defense, strives
to persuade us that the district court gave the government too free
rein in cross-examination.  We are unconvinced.
 Perry's thesis is that the challenged cross-examination
exceeded the scope of direct examination and, therefore, should
have been foreclosed.  This thesis rests primarily on the first
sentence of Fed. R. Evid. 611(b), which reads:  "Cross-examination
should be limited to the subject matter of the direct examination
and matters affecting the credibility of the witness."  Perry notes
that his direct examination consisted of only ten questions,
restricted to the Vandergroen carjacking and its sequelae.  See
infra Part IV(A)(2) (describing this carjacking).  Yet, the trial
court allowed the prosecutor, over objection, to cross-question
Perry not only about the carjacking, but also about other crimes of
which he and his codefendants were accused (including the Mendez
murder and two attempted homicides charged as predicate acts in the
RICO conspiracy count), and about a draft of a letter seized from
his jail cell in which he accused his former girlfriend of
"snitching" and requested that she be silenced.
 We review district court rulings anent the scope of
cross-examination solely for abuse of discretion.  See United
States v. Smith, 145 F.3d 458, 462 (1st Cir.), cert. denied, 119 S.
Ct. 383 (1998); United States v. Morla-Trinidad, 100 F.3d 1, 4 (1st
Cir. 1996).  We find none here.  It is standard fare for cross-
examiners to inquire into issues not mentioned on direct
examination, but related to and made relevant by that examination.  
See McGautha v. California, 402 U.S. 183, 215 (1971).  It is
equally standard   and equally proper   for a cross-examiner to
delve into matters which, although not mentioned on direct
examination, bear on the witness's credibility.  See id.  
Collectively, these two categories envelop the questions that Perry
challenges.  We explain briefly.
 The indictment charged the Vandergroen carjacking as a
predicate act within the RICO conspiracy and as a violent crime in
aid of racketeering.  At trial, the government asserted that
Vandergroen's disrespect of Perry offended the Latin King code and
led Perry to target him.  During the government's case in chief, at
least two witnesses testified in support of this theory.  Because
Perry's direct examination included a denial that the Vandergroen
incident had anything to do with the Latin Kings, the government
was entitled to test the veracity of this denial.  One way of doing
so was to interrogate Perry about other crimes that he had
committed under the organization's auspices.
 In his direct testimony, Perry also endeavored to
exonerate Lara, portraying him on direct examination as unaware   
until it was too late   that either the carjacking or the killing
would transpire.  On cross-examination, the government sought to
show that this version of events conflicted with Perry's earlier
statement to the police and to suggest that he was covering for
Lara as part of his perceived duty as a Latin King not to "rat" on
fellow gang members.  It was in this context that the prosecutor
asked about the correspondence in which Perry solicited punishment
for his loose-lipped girlfriend.  Thus, we detect no abuse of
discretion in Judge Lisi's determination that these lines of cross-
questioning were not beyond the scope of Perry's direct
examination.
 We hasten to add that, even were we to conclude that the
challenged questions exceeded the scope of direct examination, we
nonetheless would uphold the judge's rulings.  Perry's
animadversions largely overlook the second sentence of Rule 611(b),
which empowers trial courts, "in the exercise of discretion, [to]
permit inquiry into additional matters as if on direct
examination."  Fed. R. Evid. 611(b).   This authorization confers
discretion on trial judges to disregard the first sentence of Rule
611(b) and allow cross-examination to extend into areas not
explored on direct.  See Losacco v. F.D. Rich Constr. Co., 992 F.2d
382, 385 (1st Cir. 1993); United States v. Arnott, 704 F.2d 322,
324 (6th Cir. 1983); United States v. Raper, 676 F.2d 841, 846-47
(D.C. Cir. 1982).  But cf. Lis v. Robert Packer Hosp., 579 F.2d
819, 823 (3d Cir. 1978) (confining the exercise of a district
court's discretion under the second sentence of Rule 611(b)  to
"special circumstances").  In this instance, the challenged
questions occupied only a fraction of the cross-examination and
bore a close relationship to major trial issues.  Thus, whether or
not the questions fell within the scope of the direct examination,
we could not say that the trial judge's overruling of Perry's
objections constituted an abuse of discretion.
IV.  SUFFICIENCY OF THE EVIDENCE
 We next address the denial of Lara's, Boyd's, and Roman's
motions for judgment of acquittal under Fed. R. Crim. P. 29.  In
reviewing such denials, the court of appeals affords plenary review
and applies precisely the same regimen that obtains in the trial
court.  This regimen entails considering the evidence in the light
most favorable to the prosecution and determining whether this body
of proof, as a whole, has sufficient bite to ground a reasoned
conclusion that the government proved each of the elements of the
charged crime beyond a reasonable doubt.  See United States v.
Valle, 72 F.3d 210, 216-17 (1st Cir. 1995); United States v.
Olbres, 61 F.3d 967, 970 (1st Cir. 1995).  This prosecution-
friendly standard requires the resolution of all evidentiary
disputes and credibility questions in favor of the government, and
also requires the acceptance of those reasonable inferences from
the evidence (whether or not inevitable) that support the
government's view of the case.  See United States v. Carroll, 105
F.3d 740, 742 (1st Cir.), cert. denied, 520 U.S. 1258 (1997).  The
jury's verdict must stand unless the record, viewed from this coign
of vantage, would not allow a rational jury to find the defendant
guilty beyond a reasonable doubt.  See id.; see also Olbres, 61
F.3d at 970.  With these criteria in mind, we turn to the specifics
of the appellants' claims.
                     A.  Lara's Challenges.
 Lara contests the sufficiency of the evidence in regard
to two separate convictions.  We discuss these initiatives
sequentially.
 1.  Witness Intimidation.  Initially, Lara attacks his
conviction for intimidating a government witness, Manuel Pacheco
(variously referred to as "Manny" or "Joey").  As it applies in
this case, the statute of conviction requires the government to
prove two elements:  (i) that the defendant knowingly used
intimidation, physical force, or threats against another, and (ii)
that this conduct was intended to "influence, delay, or prevent the
testimony of any person in an official proceeding."  18 U.S.C.  
1512(b)(1).  The term "official proceeding" encompasses both
federal criminal trials and grand jury sessions.  See id.  
1515(a)(1)(A); see also United States v. Victor, 973 F.2d 975, 978
(1st Cir. 1992).
 The facts, marshaled in the light most flattering to the
government, amply support the jury's verdict on this count.  The
jury reasonably could have found that Pacheco aided the authorities
in their investigation of the Latin Kings, that the organization's
top brass suspected as much, and that they feared that Pacheco had
appeared (or would soon do so) as a witness before the grand jury
and/or at an ensuing trial.  In November 1994, Sepulveda (then the
president of the Providence chapter) ordered Pacheco's
"termination" (a disposition which, in Latin King parlance, might
mean anything from a beating to a slaying).
 At the time, Pacheco was housed in the Rhode Island state
penitentiary (as was Lara).  Vasquez and two fellow Latin Kings
(Alex Mesa and Rodney Santi) were dispatched to explain the
situation and communicate the order to a pickup team of
incarcerated Latin Kings.  At the penitentiary, the three
messengers visited one on one with a trio of Latin King inmates
(Lara, Kareem Abdulla, and Edson Toro) and carried out their
assignment.  To be specific, Vasquez met with Lara, Mesa with
Abdulla, and Santi with Toro.  The following evening, Lara,
Abdulla, Toro, and a fourth incarcerated Latin King, Richard
Rodriguez, approached Pacheco in a dark corner of the prison yard.  
The group surrounded Pacheco and taunted him about being a "rat."  
He was then struck from behind and savagely beaten.
 Lara declares that this evidence is inadequate because no
direct testimony showed that he received the termination order
(indeed, Vasquez testified to the contrary) or participated in
administering the beating.  These declarations comprise more cry
than wool.  Mesa and Santi testified that they rode to the prison
with Vasquez, that the three of them discussed the termination
order en route, and that they each relayed the message to the
inmate with whom they spoke.  Vasquez signed the prison's visitor
log.  He admitted visiting with Lara.  Pacheco testified that Lara
had been in the group that surrounded him and had been behind him
when he was struck from the rear.
 Although this evidence is largely circumstantial, the
jury reasonably could have disbelieved Vasquez's self-serving
denial and inferred that he followed orders (as his fellow
messengers had) and communicated the directive to Lara.  By like
token, the jury reasonably could have credited Pacheco's account
and thus inferred that Lara participated in the beating.  Any
divergent view of the evidence would elevate coincidence to an art
form.  The proof, therefore, was sufficient to convict on the
witness intimidation count.  See United States v. Castro-Lara, 970
F.2d 976, 981 (1st Cir. 1992) (explaining that "circumstantial
evidence, in and of itself, is often enough to ground a
conviction"); see also Carroll, 105 F.3d at 743 (noting, in the
context of rejecting an insufficiency challenge, the reticence of
appellate courts to "second-guess" a jury's credibility judgments).
 2.  Carjacking.  Lara and Perry were convicted of a
carjacking on September 6, 1994.  This scenario involved Temujin
Vandergroen, who apparently precipitated the incident by playing
with a knife in front of Perry's children.  Perry interpreted this
as a sign of disrespect, intolerable to a Latin King, and asked
Lara to accompany him while he relieved Vandergroen of his Ford
Escort (which was adorned with tire rims that Perry fancied).
 The two men asked Vandergroen to take a ride with them.  
When he agreed, Perry (who had brought along a sawed-off shotgun)
sat behind Vandergroen in the car, while Lara sat in the front
passenger seat.  At Perry's request, Vandergroen drove to a
deserted neighborhood.  Perry then told Vandergroen to slow or stop
the vehicle, and, when Vandergroen complied, Perry shot him.  Perry
and Lara shoved Vandergroen's body into the street and returned to
a Latin King hangout, where they were seen with blood and brain
matter on their clothing.  The two later burned and abandoned the
car.
 On these facts, the jury convicted Lara of carjacking in
violation of 18 U.S.C.  2119(3).  Lara attacks the sufficiency of
the evidence from an odd angle.  He does not allege that the
government failed to prove that he committed specific elements of
the offense, but, rather, claims that the only witness whose
testimony implicated him in the carjacking (Pacheco) was
unreliable.  This attack is impuissant.  In the usual case, the
credibility of witnesses is for the jury, see Carroll, 105 F.3d at
743; United States v. Laboy-Delgado, 84 F.3d 22, 27 (1st Cir.
1996), and there is nothing here that mitigates against the
conventional application of this rule.  There were conflicting
accounts of Lara's participation in the carjacking, and the jury
was free to decide which, if any, to believe.
 Lara has a fallback position.  Perry had given testimony
exculpating Lara from complicity in the Vandergroen carjacking.  
See supra Part III(C).  Lara hypothesizes that Perry's disgusting
courtroom conduct, see United States v. Perry, 116 F.3d 952, 954
(1st Cir. 1997), unfairly undercut this exculpatory testimony.  
But there is simply no evidence that Perry's conduct prejudiced the
jury against Lara.  When a defendant presses a plausible claim of
spillover effect, differentiated verdicts often constitute tangible
evidence of the jury's enduring ability to distinguish between the
culpability of codefendants.  See, e.g., United States v. Flores-
Rivera, 56 F.3d 319, 326 n.2 (1st Cir. 1995).  This case is of that
stripe:   even after Perry's dramatic display, the jury acquitted
Lara, but convicted Perry, on several counts, including the charge
of using or carrying a firearm during the Vandergroen carjacking.  
Then, too, the trial judge instructed the jurors soon after Perry's
gaffe that they should draw no adverse inference therefrom against
any defendant (Perry included).  See Perry, 116 F.3d at 954.  This
timely instruction further supports the conclusion that Lara was
not prejudiced by Perry's actions.  See Richardson v. Marsh, 481
U.S. 200, 206 (1987) (remarking "the almost invariable assumption
of the law that jurors follow their instructions"); United States
v. Sepulveda, 15 F.3d 1161, 1185 (1st Cir. 1993) (similar).
 To sum up, because the evidence allowed a rational jury
to find Lara guilty beyond a reasonable doubt of both witness
intimidation and carjacking, the district court did not err in
refusing to grant an instructed verdict of acquittal on either or
both of these counts.
               B.  Boyd's and Roman's Challenge.
 Boyd and Roman challenge the sufficiency of the evidence
to support their convictions for committing a violent crime (the
murder of Jose Mendez) in aid of racketeering.  The relevant facts,
stated from the perspective most conducive to the verdict, are as
follows.
 On Saturday, November 5, 1994, several members of the
Providence Latin Kings attended a party in Connecticut.  On that
occasion, they learned that their Connecticut counterparts were at
war with a rival gang, the Netas.  Two Connecticut Latin Kings
returned to Rhode Island with the Providence contingent.  One of
them, Peter Natal, later became a confidential informant.
 At a meeting of the Providence chapter held on Monday,
November 7, Sepulveda told his cohorts about the war in
Connecticut.  Immediately after this announcement, the officers of
the Providence chapter (including, at least, Sepulveda, Boyd, and
Roman) went into executive session and discussed a plan to kill the
leader of the Netas in Providence.  This strategy was hatched on
the theory that, in Sepulveda's words, "without the head, the body
falls."  The executive session ended on this note, the main meeting
resumed, and Sepulveda asked the general membership to forget what
he had said about a war.
 Natal attended the executive session.  He testified that,
during this discussion, the Latin King hierarchs noted the near-
dearth of local Netas; Providence was virgin territory and there
were only four full members of the Neta gang at that point.  Mesa
confirmed this assessment.  He testified that "there was [sic] very
few Netas out here.  There's probably like four Netas.  Each one
had a position [i.e., held an office in the gang]."  Initially,
there was confusion over whether Jose Mendez might be the president
of the Providence Netas, but a consensus gradually developed in
favor of the view that Winston Navarette held that office.
 After the meeting adjourned, several participants
repaired to the dwelling that Roman shared with his then-paramour,
Tia Barboza.  A small group, including Boyd and Roman, met in Tia's
bedroom and finalized the plan to kill the head of the Netas.  Four
members were assigned responsibility for carrying out the
assassination:  Perry, Santi, Hakim Davis, and Juan Garcia.  
Witnesses stated that Boyd and Roman each chose at least one member
of the "hit squad."  The next day, Roman distributed weapons from
the gang's cache to the appointees.
 In retrospect, it appears that, at the crucial time, the
Providence Netas had four officers:  Winston Navarette (president),
Jose Mendez (vice-president), Edgar Pichardo (disciplinarian), and
Maquiva Mendez (secretary).  The Netas lived together.  When the
hit squad arrived at their abode, they asked for Navarette and were
informed that he was out of town.  The trial testimony was
unequivocal that when the Neta president was away, the vice-
president assumed his responsibilities.  Thus, Jose Mendez,
nominally the Neta vice-president, was the head of the Netas in
Navarette's absence.
 Upon learning of Navarette's unavailability, the crew
invited Jose Mendez, who was wearing his Neta colors at the time,
to smoke some marijuana.  The group, now five in number, walked to
a nearby field where Perry shot Mendez from behind, killing him.  
The four Latin Kings fled.
 Boyd claims that this evidence failed to link him
sufficiently to Mendez's murder.  He argues that even the most
generous view of the evidence fails to support the jury's verdict
because there was no evidence (1) that the plan was to kill
whomever was the Neta leader, (2) that the shooter was aware that
his target was the de facto leader, or (3) that the shooter knew
Mendez had become the de facto leader of the Netas in Navarette's
absence.
 Before coming to grips with these arguments, we address
a procedural issue.  Roman did not raise the sufficiency question
in his opening brief, but, after perusing Boyd's brief, sought
leave from this court to adopt the argument.  By order entered
February 1, 1999, we granted this request provisionally, subject to
a final determination after the case was heard.
 The standard for adoption of arguments by reference
involves a determination of whether the arguments are "readily
transferrable from the proponent's case to the adopter's case."  
David, 940 F.2d at 737.  We ordinarily look with disfavor upon
attempts to adopt factbound arguments by reference.  See, e.g.,
Castro-Lara, 970 F.2d at 982; David, 940 F.2d at 737.  Under the
peculiar circumstances of this case, however, we allow the
adoption.  Roman, like Boyd, moved for judgment of acquittal below,
and relied on the same three grounds in support of his claim that
the evidence was insufficient to convict him of Mendez's murder.  
More importantly, although the evidence as to each varies on the
first two grounds, Boyd's arguments are generally relevant to
Roman, who, like Boyd, was a part of the officers' meetings, but
not a member of the crew sent to carry out the execution.  Thus,
the David "ready transferability" standard is satisfied and we will
entertain the insufficiency claims of both appellants.
 Boyd's and Roman's first two points are easily
dispatched.  Davis, a first-hand participant, described the plan
and the implementing order as being aimed at killing the head of
the Netas.  This order was given in the presence, and with the
acquiescence, of Boyd and Roman.  It was designed as a preemptive
strike on the Neta leadership.
 Although some of the witnesses whose testimony the
government hawks had made prior inconsistent statements, the same
is true for several witnesses whose testimony Boyd and Roman
espouse.  The jurors were entitled to choose which witnesses to
credit, and, in the posture of a sufficiency-of-the-evidence
challenge, we must assume that they credited those witnesses whose
testimony lent support to the verdict.  See Carroll, 105 F.3d at
742-43; Laboy-Delgado, 84 F.3d at 27-28.  At any rate, jurors are
not required to discard testimony that appears to contain internal
inconsistencies, but may credit some parts of a witness's testimony
and disregard other potentially contradictory portions.  See United
States v. O'Brien, 14 F.3d 703, 707 (1st Cir. 1994).
 The third deficiency to which Boyd and Roman allude is
more nettlesome.  The government offered no direct evidence that
the shooter (Perry) knew of Jose Mendez's position as de facto
leader of the Netas at the time of the murder.  Still, direct
evidence is not essential to proof of criminality.  See id. at 706-
07; Castro-Lara, 970 F.2d at 981; United States v. Ortiz, 966 F.2d
707, 711 (1st Cir. 1992).  In this instance, the circumstantial
evidence is telling:  the proof (particularly the testimony of
Natal and Mesa) showed that at least some Latin Kings knew there
were only four full-fledged members of the Netas in Providence, and
that all of them were officers of the gang.  Mendez's name was
bandied about at the executive session (which both Boyd and Roman
attended) as the possible head of the Netas.  Although consensus
later formed around the idea that Navarette occupied the top rung
on the ladder, the discussion of Mendez's involvement strongly
suggests that the Latin King leadership was keenly aware that he
held a relatively high position in the Netas.
 We have held before that evidence of events that occur
subsequent to the commission of a crime can shed light upon an
actor's guilt vel non.  See, e.g., United States v. Sutton, 970
F.2d 1001, 1007 (1st Cir. 1992); United States v. Mena, 933 F.2d
19, 25 n.5 (1st Cir. 1991).  In this instance, evidence of the
Latin King leaders' reaction to the murder bolsters the
government's case.  Davis recalled that Sepulveda, then the Latin
King president, responded to the report of Mendez's demise by
remarking that the hit squad had done a good job.  Moreover, the
Latin Kings did not mount a manhunt for Navarette after the Mendez
murder because, in Davis's words, their "mission" had been
completed successfully.
 Jurors are entitled to draw reasonable inferences from
proven facts.  On this record, we think that two key inferences are
supportable.  First, the jury reasonably could have inferred that
Perry was aware of Mendez's leadership role in the Netas.  Second,
the jury reasonably could have inferred that when the hit squad
encountered Mendez, its members believed that he was likely the
highest available member of the Neta leadership and killed him for
that reason, in compliance with the order that had issued.  Boyd's
and Roman's alternate hypothesis   that Navarette's absence foiled
the plot, and that Perry killed Mendez in order to satisfy his
bloodlust   was not implausible, but the jury rejected it in favor
of a finding that Perry pulled the trigger to effect the directive
that had been handed down by the Latin King hierarchs.  This choice
fell well within the jury's proper purview.  See United States v.
Gifford, 17 F.3d 462, 467 (1st Cir. 1994) (noting that the evidence
"need not rule out other hypotheses more congenial to a finding of
innocence" in order to defeat a Rule 29 motion).  Thus, we conclude
that the evidence suffices to sustain the disputed convictions.  
See Bourjaily v. United States, 483 U.S. 171, 179-80 (1987)
(explaining that "individual pieces of evidence, insufficient in
themselves to prove a point, may in cumulation prove it"); Stewart
v. Coalter, 48 F.3d 610, 615-16 (1st Cir. 1995) (discussing
permissible inferences in criminal cases).
V.  JURY INSTRUCTIONS
 Lara offers several complaints about the district court's
jury instructions on the carjacking count.  Only one of these
points deserves comment.
 Tracking the applicable statute, 18 U.S.C.  2119(3) (see
supra note 5), the court instructed the jury that it must find four
elements in order to convict:  (1) that the named defendants (Lara
and Perry), by means of force or violence, (2) took from the person
or presence of Vandergroen a motor vehicle (3) that previously had
been transported, shipped, or received in interstate or foreign
commerce, and (4) that one or both of the named defendants
possessed a firearm at the time.  Lara's most fervent challenge,
properly preserved, concerns the court's elaboration upon the
fourth element.  The court stated:
   [T]he government must prove that at least one
 of the two defendants was in possession of a
 firearm.  A person has possession of something
 if the person knows of its presence and has
 physical control of it, or has the power and
 intention to control it.  More than one person
 can be in possession of something if each
 knows of its presence and has the power and
 intention to control it.

Lara condemns this instruction because it allowed the jury to
convict him although only Perry actually possessed a firearm.  And
to illustrate the harmfulness of this error, Lara points out that
the jury acquitted him on a related charge of using or carrying a
firearm during a crime of violence, 18 U.S.C.  924(c).
 In the face of properly preserved objections, we evaluate
challenged jury instructions under an abuse of discretion rubric,
considering the charge as a whole.  See DeStefano, 59 F.3d at 2-3;
United States v. Cintolo, 818 F.2d 980, 1003 (1st Cir. 1987).  So
viewed, Judge Lisi's possession instruction passes muster.  The
indictment charged Lara not only as a principal in the carjacking,
but also as an aider and abettor under 18 U.S.C.  2.  In her
instructions, Judge Lisi described the workings of the latter
statute in considerable detail, stating, inter alia, "you may find
a defendant guilty of the offense charged if you find beyond a
reasonable doubt that the government has proven that another person
actually committed the offense with which the defendant is charged,
and that the defendant aided, abetted, induced, or procured that
person to commit the offense."  She later described the carjacking
count as charging Perry and Lara with having violated both section
2119(3) and section 2.  Thus, under the instructions, as long as
the jury found that either Perry or Lara intended to take
Vandergroen's vehicle by forcible or violent means and carried a
firearm to that end, the other defendant could be found guilty as
an aider and abettor if he knew of the plan and intended to assist
in its accomplishment.  This correctly reflects applicable law.  
See United States v. Oliver, 60 F.3d 547, 551 (9th Cir. 1995),
rev'd on other grounds sub nom. Jones v. United States, 119 S. Ct.
1215 (1999); United States v. Harris, 25 F.3d 1275, 1278-79 (5th
Cir. 1994).
 The jury's acquittal of Lara on the section 924(c) count
does not discredit this conclusion.  For one thing, the
instructions on that count did not make provision for aider/abettor
liability, and, therefore, the verdicts were not inconsistent.  For
another thing, the two statutes differ in a material respect.  
Section 2119(3) discusses "possession" of a firearm, while section
924(c) discusses "use and carr[iage]."  Because the definitions of
"use" and "carry" under section 924(c) denote more than mere
possession, a jury reasonably can find, without any logical
inconsistency, that a defendant who meets the requirements of the
possession element under section 2119 does not meet the more
rigorous requirements imposed by section 924(c).  See Muscarello
v. United States, 118 S. Ct. 1911, 1914 (1998) (discussing
carriage); Bailey v. United States, 516 U.S. 137, 143 (1995)
(discussing use).
 If more were needed   and we do not think that it is   we
note that Lara's complaint, as framed, seems to arise more from the
perceived mismatch between his acquittal under section 924(c) and
his conviction under section 2119(3) than from any actual flaw in
Judge Lisi's charge to the jury.  Thus   although Lara disclaims
such a theorem   we are left with the decided impression that a
claim of inconsistent verdicts lies at the heart of this assignment
of error.  In recent times, we repeatedly have rejected such
challenges to criminal verdicts, see, e.g., United States v.
Crochiere, 129 F.3d 233, 239 (1st Cir. 1997), cert. denied, 118 S.
Ct. 1364 (1998); United States v. Bucuvalas, 909 F.2d 593, 594 (1st
Cir. 1990), and nothing about this case differentiates it from the
mine-run.
VI.  CONCLUSION
 We need go no further.  A painstaking review of this
amplitudinous record reveals that the appellants were convicted by
a properly constituted jury after a full and fair trial, free from
reversible error, before a judge who exhibited extraordinary care
and patience.  Their appeals are without basis in fact or in law.

Affirmed.

</body>

</html>